Sylvia POUNCY, Plaintiff,

v.

**VULCAN MATERIALS COMPANY,**
Cindy Alford, Harry Nelson,
Defendants.

No. CV94–H–1906–S.

United States District Court,
N.D. Alabama,
Southern Division.

Feb. 16, 1996.

Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for plaintiff.

James P. Alexander, Arnold W. Umbach, III, Bradley Arant Rose & White, Birmingham, AL, Samuel C. Campisi, C. Michael Quinn, Gregory O. Wiggins, Deborah A. Mattison, Gordon Silberman Wiggins & Childs, Birmingham, AL, for defendants.

## MEMORANDUM OF DECISION

HANCOCK, District Judge.

The court has before it the July 31, 1995 motion for partial summary judgment filed by defendants Vulcan Materials Company ("Vulcan"), Cindy Alford, and Harry Nelson (collectively "defendants"). Pursuant to the court's July 31, 1995 order, as amended on August 23, 1995, the motion was deemed submitted for decision, without oral argument, as of September 5, 1995.

Plaintiff Sylvia Pouncy ("Pouncy") initiated this action by filing a complaint in this court on August 5, 1994. The complaint, as amended on September 22, 1994, includes claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), the Americans with Disabilities Act, and state law claims for invasion of privacy and interference with business relations.

 Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of

file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2510–11.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick,* 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428 (11th Cir.1991) *(en banc)).*

 If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick,* 2 F.3d at 1115. If the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

 If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. If the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial

burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick,* 2 F.3d at 1115–16. The affirmative showing may be accomplished by reference to any combination of the following: pleadings; deposition testimony of a party or its witness; affidavits; responses to interrogatories or failure to respond to interrogatories; requests for admission and responses thereto; and other exchanges between the parties that are in the record. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991); *see also Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.[1]

The parties agree, in large part, on many of the facts relevant to this motion. The headquarters and corporate offices of Vulcan are located in Birmingham, Alabama. (Pouncy Depo. at pp. 677–78, DX 40). Vulcan employed Pouncy from 1971 until March 8, 1993, when Pouncy was terminated from her position in Corporate Information Services. (Pouncy Depo. at p. 463–67, DX 1).

The relevant undisputed portions of Pouncy's employment history are as follows. In late 1987 Pouncy worked in the area of Computer Operations. She interviewed with Harry Nelson, Director of Corporate Information Services at Vulcan, for a position as a Database Coordinator in Systems and Programming. Pouncy was selected for the position and transferred to the Systems and Programming department in February of 1988. (Pouncy Depo. at pp. 73–75, 86–87). Pouncy's principal responsibility as a Database Coordinator was to act as a liaison between the computer users throughout Vulcan's various divisions and the programmers in the Corporate Information Services Department. (Pouncy Depo. at pp. 73–74, 109). Until November of 1988, Pouncy's immediate supervisor was Danny Cosby. In November of 1988, Libbet Crumbley was made the Manager of Corporate Information Systems, and she replaced Mr. Cosby as Pouncy's immediate supervisor. (Pouncy Depo. at pp. 109–11).

In February of 1991, Ms. Crumbley reorganized the Systems and Programming area by creating three new supervisory positions that would report directly to her. The three new intermediate supervisors would be responsible for a team of employees. (Alford Depo. at pp. 10–11; Crumbley Depo. at pp. 55–56). Following the reorganization, Cindy Alford became the Supervisor of the Systems Support Team, and, therefore, Pouncy's immediate supervisor. The Systems Support Team was responsible for the following areas: data security, quality assurance testing,

---

1. In support of the motion for partial summary judgment, defendants submitted a brief and filed excerpts of the deposition of Pouncy and the exhibits thereto, excerpts from the deposition of Cynthia Alford, excerpts from the deposition of Elliot Bell, excerpts from the deposition of Mary J. Crumbley, excerpts from the deposition of Patricia Hendrix, excerpts from volume two of the deposition of Harry L. Nelson, excerpts from the deposition of Laura Russell, excerpts from the deposition of Peter Printz, Response No. 2 to Plaintiff's Interrogatories, and the affidavit of Pamela Burks, Ed.D.

In opposition to the motion for partial summary judgment, Pouncy filed a response to the motion for partial summary judgment and filed the depositions of the following individuals—Laura Russell, Mary J. Crumbley, Pouncy, Peter Printz, Cindy Alford, Harry Nelson, Jo Spradling, Jack Riley, Wayne Houston, and Elliot Bell, as well as the following exhibits—documents from files maintained by Cindy Alford, documents from files maintained by Elliot Bell, documents from files maintained by Harry Nelson, documents from files maintained by Libbet Crumbley, documents produced by Vulcan pursuant to discovery requests, Cindy Alford's application, Stacy Lynn's personnel file and exit interview, employee assistance documentation, excerpts from Pouncy's Career Development Survey created by Pam Butke, and Pouncy's performance evaluations for 1989, 1990, 1991, and 1992.

technical writing, training, and user support. (Crumbley Depo. at p. 26). Pouncy was the only employee that reported to Ms. Alford. (Pouncy Depo. at p. 169; Alford Depo. at pp. 10–12). At the time of the reorganization in 1991, Ms. Crumbley also created four job titles and corresponding grade levels within the Systems Support area: Systems Support Specialist, Systems Support Specialist II, Senior Systems Support Specialist, and Supervisor of Systems Support. (Crumbley Depo. at pp. 54–55). Ms. Crumbley gave Pouncy the title of Systems Support Specialist II which meant that Pouncy received a grade level increase from her position as Database Coordinator as well as additional responsibilities. Pouncy complained to Ms. Crumbley, however, because she did not also receive an increase in pay, and Ms. Crumbley responded that Pouncy had a bad attitude. (Pouncy Depo. at pp. 137–41, 169).

Despite the change in title and responsibilities, for most of the first year in her new position, Pouncy continued to perform the same type of user support functions as she had as a Database Coordinator. (Alford Depo. at pp. 18, 28). However, as the users became more proficient using the database systems, they had a decreased need for user support and an increased need for additional "procedures documentation." (Alford Depo. at pp. 16, 28–29, 32). Thus, Pouncy's job duties changed to correspond to the changing needs. Pouncy was asked to help more in the area of technical writing and to also spend more time in quality assurance testing and data security. (Alford Depo. at pp. 31, 34; Pouncy Depo. at pp. 195–97, 424–28). In February of 1992, Pouncy was promoted to Senior Systems Support Specialist, the highest level non-supervisory position in her area. (Pouncy Depo. at p. 161).

In March of 1992, Pouncy was assigned to work with Elliot Bell, Accounting and Sales Database Supervisor, and meet with certain personnel in the Southern Division to determine and document the procedures used by the Southern Division in balancing their accounts receivable. (Bell Depo. at pp. 6–11; Pouncy Depo. at pp. 236–39). Pouncy presented a draft of the procedures to Mr. Bell in August of 1992. Mr. Bell asked Pouncy to revise the draft because it was too detailed. Pouncy revised the draft, however, on August 19, 1992, Mr. Bell told Pouncy there was additional information he needed to be included in the draft. Ms. Alford was included in Mr. Bell's meeting with Pouncy to assist him in explaining instructions to Pouncy. (Pouncy Depo. at pp. 245–57, 319; Alford Depo. at pp. 62–64). Ms. Alford asked Pouncy to return to the Southern Division to complete the project, but Pouncy stated that she did not want to go because she did not want to bother the Southern Division as they were involved in a merger with Vulcan's Chattanooga Division, and she stated that she was confused and frustrated because Mr. Bell had changed his mind about the project. Mr. Bell also became frustrated and left the meeting. (Pouncy Depo. at pp. 254–55, 311–16; Alford Depo. at p. 63). Ms. Alford reported the incident to Mr. Nelson and Ms. Crumbley because she considered Pouncy's refusal to return to the Southern Division insubordination. (Alford Depo. at pp. 54, 60; Nelson Depo. Vol. I at pp. 99–100).

In 1992 Pouncy accompanied Joe Parks, the Supervisor of the Human Resources and Payroll Database team, on one of his trips to the various divisions to discuss the payroll database. Defendant asserts, but Pouncy disputes, that following the trip Mr. Parks told Mr. Nelson that he did not want Pouncy to accompany him to any more meetings because she was disruptive and distracting and asked impertinent questions that detracted from the meeting. Mr. Park's complaints occurred around the same time as Ms. Alford's report of insubordination regarding the Southern Division project. (Nelson Depo. Vol. I at p. 99).

Also in the fall of 1992, Mr. Nelson stated that he observed Pouncy having problems producing run sheets. When he attempted to give her suggestions, she responded each time by saying "that won't work" or "we can't do that." Mr. Nelson thought that such behavior indicated that Pouncy was not interested in reaching a solution. (Nelson Depo. Vol. I at pp. 48–51, 63–64).

The defendants state that in addition to the above circumstances, Pouncy had a history of a negative attitude and problems per-

forming her job. However, Pouncy disputes defendants' characterization of the following events.

Mr. Nelson stated that he had the opportunity to observe Pouncy's performance when she worked in Computer Operations and noticed several occasions when Pouncy was uncooperative and argumentative. When Pouncy was transferred to Systems and Programming in early 1988, Mr. Nelson told Pouncy of his concerns about her disruptive behavior. (Nelson Depo. Vol. I at pp. 19, 41). Mr. Nelson stated that Pouncy had consistently displayed a negative attitude and was argumentative and uncooperative which interfered with her performance of her job functions. (Nelson Depo. Vol. I at p. 118).

During Pouncy's tenure in Systems and Programming from 1988 to her termination on March 8, 1993, Ms. Crumbley received criticism of Pouncy's performance from the programmers in the department. The programmers stated that for someone at Pouncy's level, they were having to spend more time than should be necessary explaining changes to the systems and reviewing the changes with Pouncy so that she could explain them to the users. (Crumbley Depo. at pp. 70–71, 74–77, 116–17). The problem was addressed in Pouncy's 1989 and 1990 performance reviews by stating that Pouncy needed to expand her knowledge of the applications. (Crumbley Depo. at pp. 71–73; Pouncy Depo. at pp. 112–24, DX 3 and 4). Ms. Crumbley finally reached the conclusion that Pouncy was either unable to learn the systems or did not apply herself to learn them. (Crumbley Depo. at pp. 77, 120–21).

During this time Ms. Crumbley also received reports that Pouncy had a negative attitude, and she noted this problem in Pouncy's 1989 and 1990 performance reviews. (Crumbley Depo. at pp. 210–24; Pouncy Depo. at pp. 112–24, DX 3 and 4). Pouncy also discussed with Ms. Crumbley the difficulties she was having with co-employees. (Pouncy Depo. at p. 124).

Ms. Alford also reported problems with Pouncy's performance after Pouncy's job responsibilities started changing in her position as Systems Support Specialist II. (Alford Depo. at pp. 41–42, 113). However, as a motivational tool, Ms. Alford suggested that Pouncy be promoted to Senior Systems Support Specialist in light of her new and additional job duties. The suggestion was poorly received by other supervisors in the department, but Pouncy was promoted in February of 1992. (Pouncy Depo. at pp. 161–62, DX 7; Crumbley Depo. at pp. 343–44). In 1992, Pouncy was also sent to two writing seminars chosen by Ms. Alford to improve Pouncy's technical writing skills. (Pouncy Depo. at pp. 153, 158, DX 5). However, Ms. Alford received complaints from programmers regarding Pouncy's deficiencies in handling technical information. The programmers reported that Pouncy was not progressing in her ability to resolve technical problems raised by the users, and instead passed on technical problems to the programmers. (Alford Depo. at pp. 114, 320–21). Ms. Alford also criticized Pouncy's writing skills and stated that Pouncy did not accept feedback positively. (Pouncy Depo. at p. 152, DX 5).

Laura Russell, the Manager of Corporate Human Resources, stated that she received complaints from Pouncy's co-workers that Pouncy would talk excessively to them about personal problems, and that she also would avoid Pouncy in the hall to avoid long discussions about non-work related matters. (Russell Depo. at pp. 160, 165, 218, 228).

Defendants state that after the incident with Ms. Alford regarding the Southern Division project and the complaint by Mr. Parks were brought to his attention, Mr. Nelson had a meeting with Ms. Crumbley, Ms. Alford, Mr. Parks, and Mr. Bell to discuss Pouncy's performance. They agreed that Pouncy should be confronted with the problems in her performance. (Nelson Depo. Vol. I at p. 100). Ms. Crumbley and Ms. Alford consulted with Ms. Russell, and decided to present Pouncy with a written document listing the areas Pouncy needed improvement. Ms. Crumbley and Ms. Alford had Ms. Russell review the document before they presented it to Pouncy. (Russell Depo. at pp. 25, 29, 102–06, 181–83).

Mr. Nelson, Ms. Crumbley, and Ms. Alford, after discussing with the Personnel De-

partment what additional measures could be taken to correct Pouncy's performance deficiencies, decided that a career counselor might be more effective than they had been in helping Pouncy to change her bad attitude and behavior.[2] (Nelson Depo. Vol. I at pp. 246, 249; Alford Depo. at p. 110; Russell Depo. at pp. 29–31). Peter Printz, Chief Labor Counsel, Director of Safety, Health and Environment, recommended that Mr. Nelson send Pouncy to Drake Beam Morin, Inc., a counseling firm that worked primarily in the interest of the employee, as opposed to the employer. (Printz Depo. at pp. 7, 17–19; Alford Depo. at pp. 110–11; Crumbley Depo. at pp. 512–13). Mr. Nelson, Ms. Crumbley, and Ms. Alford met with Pam Butcke[3], a Vice President and counselor at Drake Beam Morin, Inc., to discuss the problems they were having with Pouncy's performance. (Nelson Depo. Vol. I at pp. 249–50; Crumbley Depo. at p. 513). It was their understanding that Ms. Butcke would attempt to help Pouncy identify her strengths, weaknesses and interests and help her formulate and "action plan" to help her be successful in her job. (Nelson Depo. Vol. I at pp. 259–60; Alford Depo. at p. 182; Crumbley Depo. at pp. 558–59). Ms. Butcke told Mr. Nelson, Ms. Crumbley, and Ms. Alford that she would provide them with a periodic review to let them know how things were going in general but that the details of her conversations with Pouncy would be confidential. (Crumbley Depo. at pp. 568–69).

On September 18, 1992, Ms. Crumbley and Ms. Alford presented Pouncy with a written document listing the areas in which Pouncy needed improvement to continue working at Vulcan. At this time, they also told Pouncy that Vulcan had arranged for Pouncy to meet with a career counselor. (Pouncy Depo. at pp. 354–61, DX 12). Mr. Nelson then met with Pouncy to make sure that Pouncy understood the problems identified by Ms.

Crumbley and Ms. Alford and what she needed to do to keep her job. (Nelson Depo. Vol. I at p. 279; Pouncy Depo. at pp. 365–68). During this meeting, Pouncy told Mr. Nelson that she was being treated unfairly and that "[she] wasn't the one with the behavior problem." (Pouncy Depo. at pp. 365–68).

Pouncy met with Ms. Butcke on three or four occasions. Ms. Butcke told Pouncy that the only things she would report to Vulcan was the fact that they had met on a certain day and the length of the meeting. (Pouncy Depo. at pp. 372–73, 378). In the first meeting, Pouncy and Ms. Butcke discussed the items and expectations set out in the document given to Pouncy by Ms. Crumbley and Ms. Alford. (Pouncy Depo. at p. 379). Ms. Butcke administered some tests to Pouncy including the Myers–Briggs personality test. (Pouncy Depo. at pp. 380–82). After the third or fourth session, Ms. Butcke told Pouncy that they did not need to meet again. (Pouncy Depo. at pp. 387).

Pouncy, on the other hand, paints a very different picture of her employment history with Vulcan. Pouncy states that the evidence shows she was friendly and caring and had an excellent relationship with database users. She was good in the users report and quality assurance testing areas, the users considered her helpful in solving problems that were not too technical, and she had been a valuable contributor in the success of information systems installation, support, and maintenance. (Crumbley Depo. at pp. 183–86; Nelson Depo. Vol. I at pp. 271; Alford Depo. at p. 261). Pouncy further states that her 1990–91 evaluation reflects a good working relationship with Mr. Bell and other employees in the programming operations department. (Crumbley Depo. at pp. 185–86). Pouncy claims that the defendants' characterization of her attitude and personality are not consistent with the results of the personality tests performed by Ms. Butcke. Poun-

---

**2.** This was not the first time an employee with performance problems was sent to a career counselor. Mr. Nelson had previously sent Elliot Bell to a career counselor because Mr. Bell was condescending to co-workers when they did not agree with him. This trait put co-employees on the defensive around Mr. Bell and was disruptive to the operation of the department. Mr. Nelson believed the counselor could help Mr. Bell un-

derstand his performance problems and take action to correct them. Mr. Bell went to counseling and is still employed at Vulcan in the same department. (Nelson Depo. Vol I at pp. 205–14).

**3.** Ms. Butcke's last name is now Burks. (Burks Aff., ¶ 1).

cy asserts that she was meeting or exceeding defendants' expectations from the change in her job in February of 1991 until the time of her promotion in 1992. (Crumbley Depo. at pp. 339–40, 509–11).

Both parties agree on the following facts. In early November of 1992, Ms. Butcke provided a progress report to Mr. Nelson, Ms. Crumbley and Ms. Alford in a telephone conference over a speaker telephone in Mr. Nelson's office. (Nelson Depo. Vol. I at pp. 267–69). Ms. Butcke stated that she did not believe that Pouncy's problems were all work-related, and in her opinion, without long-term personal counseling, continuing the career counseling sessions with Pouncy would not be effective. (Nelson Depo. Vol. I at pp. 260–61; Alford Depo. at p. 223).

Part of this telephone conference was overheard by Mr. Nelson's secretary, Patti Hendrix, because the door to Mr. Nelson's office was left open. (Hendrix Depo. at p. 27). After she realized that she could hear the conversation, Ms. Hendrix closed the door, and could not hear the call anymore. (Hendrix Depo. at p. 30). Ms. Hendrix told Mr. Nelson and Pouncy that she had overheard part of the call. (Hendrix Depo. at p. 30; Pouncy Depo. at pp. 398–403). Pouncy cannot recall exactly what Ms. Hendrix told her other than Pouncy was the topic of the telephone conference. (Pouncy Depo. at pp. 398–99). Ms. Hendrix did not tell anyone else about the call and does not know if any other employees heard the call, and no one else told Pouncy that they had overheard the call. (Hendrix Depo. at pp. 29, 32; Pouncy Depo. at pp. 402–03). After learning of the telephone conference, sometime in 1993, Pouncy had a meeting with Mr. Nelson and told him that she was upset by the call because she understood that her sessions with Ms. Butcke would be confidential. Mr. Nelson replied that they had not intended for the call to be overheard. (Nelson Depo. Vol. I at p. 269; Pouncy Depo. at pp. 399–404). In fact, Mr. Nelson stated that he was surprised that Ms. Butcke had told him that she felt Pouncy needed personal counseling. (Nelson Depo. Vol. I at pp. 218, 261). However, despite this information, Mr. Nelson stated that he had no reason to believe Poun-

cy had a psychological problem. (Nelson Depo. Vol. I at p. 217–18).

On approximately November 17, 1992, Ms. Alford had a routine performance evaluation with Pouncy to discuss Pouncy's job objectives. (Pouncy Depo. at pp. 416–17). Pouncy states that during the course of the meeting, Ms. Alford asked her if she was using the services of Vulcan's Employee Assistance Program for long-term counseling. (Pouncy Depo. at pp. 416–18, DX 17). Pouncy replied that it was personal and confidential whether she was going to long-term personal counseling. (Pouncy Depo. at pp. 416–18, DX 17). Pouncy states that Ms. Alford then stated that if Pouncy did not tell her the efforts she was making with respect to counseling, Pouncy could lose her job. (Pouncy Depo. at pp. 418, 445). Ms. Alford states that she asked about long-term personal counseling, as recommended by Ms. Butcke, because Ms. Alford believed that if Pouncy was seeking such counseling it would demonstrate a sincere interest by Pouncy to improve her job performance. (Alford Depo. at pp. 219–25). Ms. Alford recorded this incident in Pouncy's annual performance review because she believed Pouncy's response to her inquiry was inappropriate. (Alford Depo. at pp. 221–22; Pouncy Depo. DX 17).

There was no policy at Vulcan that prohibited a supervisor from asking an employee if he or she had gone or was going to a counselor pursuant to the employee assistance program, but that was usually the extent of the inquiry. (Russell Depo. at pp. 145–46). Ms. Russell stated that in Pouncy's case, it was her opinion that the inquiry was not inappropriate because it was Pouncy's supervisors and Ms. Russell's belief that counseling would be central to Pouncy's job success. (Russell Depo. at pp. 215–16).

On February 24, 1993, Ms. Alford gave Pouncy her annual performance evaluation. Ms. Alford gave Pouncy an overall "needs improvement" rating. Pouncy strongly objected to the rating and wrote down several things she had done that year in an effort to show Ms. Alford that the rating was too harsh. In response, Ms. Alford agreed with Pouncy on some points and modified the evaluation accordingly. However, Pouncy's

overall rating still remained "needs improvement." Pouncy disagreed with the rating and refused to sign the evaluation. (Pouncy Depo. at pp. 309, 437, DX 17).

After receiving the performance evaluation, Pouncy requested a meeting with Mr. Nelson and told him that, according to Ms. Alford, the bad performance rating was "their" fault because Pouncy had not been given any training in technical writing. Mr. Nelson told Pouncy that he had noticed an improvement in her behavior, and Pouncy responded that Ms. Alford stated she had seen an improvement as well, but this fact was not reflected in her overall performance rating. (Pouncy Depo. at pp. 412–14).

At some point, Pouncy asked Mr. Nelson to transfer her out of the department. (Pouncy Depo. at pp. 455–56). Mr. Nelson spoke with Jim Lambert in Operations about a position for Pouncy. Mr. Lambert indicated that he had a position Pouncy could perform, but he objected to her transfer to that position because he felt she was too disruptive. (Nelson Depo. Vol. I at pp. 228–29). The Human Resources department also questioned transferring a problem employee. (Nelson Depo. Vol. II at pp. 96–98).

On March 5, 1993, Mr. Nelson met with Pouncy and told her that the company could not give her a transfer. (Nelson Depo. Vol. II at p. 152; Pouncy Depo. at p. 461). According to Pouncy, Mr. Nelson told her that she was being denied a transfer due to her reaction to her performance appraisal. (Pouncy Depo. at p. 461). During the meeting with Mr. Nelson, Pouncy became angry and told Mr. Nelson that she was going to hold him personally responsible for what happened to her on the job. She also told him that "[she was] not going to put up with this bullshit any longer," and that she believed Ms. Alford was trying to replace her with Stacy Lynn, a programmer. (Nelson Depo. Vol. II at pp. 158, 160; Pouncy Depo. at pp. 461–63).

Mr. Nelson had considered presenting Pouncy with a "last chance agreement" that had been recommended to him by the Human Resources Department, however, based on Pouncy's conduct during his meeting with her, Mr. Nelson concluded that the "last chance agreement" would only prolong the problem and that she should be terminated. (Response to Pl.'s Interrogatories, Response No. 2; Alford Depo. at pp. 213–14, 254; Nelson Depo. Vol. II at pp. 155–56).

Before terminating Pouncy, Mr. Nelson consulted a number of managers in the department, Ms. Crumbley, Mr. Bell, Mr. Parks, Ms. Alford, and Jim Lambert. Mr. Nelson also consulted with an in-house labor lawyer in the Corporate Human Resources Department and Dan Sansone, the Vice-President of Finance and Mr. Nelson's superior. (Nelson Depo. Vol. II at pp. 94–96). Mr. Sansone wanted to make sure that a transfer was not possible, so Mr. Nelson checked with Mr. Houston again. Mr. Houston confirmed that the company could not transfer an employee who was having performance problems. (Nelson Depo. Vol. II at pp. 96–97).

Mr. Nelson and Van Waldrop, an in-house labor lawyer, met with Pouncy on Monday, March 8, 1993 to inform Pouncy that she was terminated. Pouncy asked why she was being terminated, and Mr. Nelson told her that her performance was unsatisfactory. (Pouncy Depo. at pp. 464–68). Before she left the premises, Pouncy told several employees in the department that she had been fired. (Pouncy Depo. at pp. 471–73).

The next day, Mr. Nelson held a meeting with the employees in the department to tell them of Pouncy's termination. He told the employees that he wanted to "strike a balance between open communications with employees and being fair to Sylvia," by telling them of Pouncy's termination before they heard it through "the grapevine." He told the employees that the termination was not a spur of the moment action, and that Pouncy was terminated because she did not perform her job as expected. He also told the other employees that the company had provided Pouncy with an employee counselor. (Nelson Depo. Vol. I at p. 272; Crumbley Depo. at pp. 563–66). However, Mr. Nelson did not distinguish between this type of counseling and personal counseling under the Employee Assistance Program. (Nelson Depo. Vol. I at pp. 170, 269–70, PX 17A). Pouncy does not

believe that she has a disability, but she thinks that Vulcan may have perceived her as being mentally disabled. (Pouncy Depo. at pp. 601–05).

After her termination, Pouncy received several phone calls from her former co-workers. These co-workers informed her of the meeting held by Mr. Nelson and told her that the meeting was held to explain her termination and the company's efforts to help her with counseling. (Pouncy Depo. at pp. 476–78, 484–88).

After her termination, Pouncy hired an agency, "Documented Reference Check," to call Ms. Alford for an "employment reference." (Alford Depo. at pp. 48–49; Pouncy Depo. at pp. 643–45, DX 34). A transcript was made of the phone call. (Pouncy Depo. DX 34). However, Pouncy was not applying for employment with the agency, and no potential employer has told Pouncy what, if anything, Vulcan has stated about her. (Pouncy Depo. at pp. 645, 669).

Defendants have not sought summary judgment with respect to Pouncy's age discrimination claim.

*Individual Liability on ADEA and ADA claims:*

■ The Eleventh Circuit has clearly held that the relief granted under Title VII is against the employer, not employees in their individual capacity. *Edwards v. Wallace Community College,* 49 F.3d 1517, 1520 n. 3 (11th Cir.1995). Therefore, supervisory employees, although agents of the employer, are not "employers" under Title VII. *See Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991). Recently, the Eleventh Circuit extended this principle to ADEA cases as well. *Smith v. Lomax,* 45 F.3d 402, 403–04, n. 4 (11th Cir.1995). Because Vulcan is already named as a defendant in this action, defendants Nelson and Alford are entitled to summary judgment on Pouncy's ADEA claim.

■ Using the same reasoning, defendants Nelson and Alford are entitled to summary judgment with respect to Pouncy's ADA claim as well. As shown above, courts have relied on the *McDonnell Douglas* framework for claims brought under several discrimination statutes. The reason is that the statutes often contain similar definitions and have similar purposes. In fact, the definition of "employer" under the ADA is identical to the definition contained in Title VII. *Edwards,* 49 F.3d 1517, 1520, n. 3 (11th Cir.1995). Therefore, using the Title VII cases as a guide, defendants Nelson and Alford are entitled to a judgment in their favor with respect to Pouncy's ADA claim because Pouncy's employer is already named as a defendant to this action. *See EEOC v. AIC,* 55 F.3d 1276, 1279–82 (7th Cir.1995) ("[I]ndividuals who do not independently meet the ADA's definition of 'employer' cannot be held liable under the ADA.").

*ADA claim:*

■ Initially, the court notes that in any case involving employment termination in Alabama, it must be remembered that an employer can discharge an at will employee for a good reason, a bad reason, or no reason at all, as long as the discharge is not the result of illegal discrimination. One form of illegal discrimination is discrimination on the basis of a disability. Congress enacted the ADA to "level the playing field" for disabled people and thereby combat employment decisions based on unfounded stereotypes. *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995) (citation omitted). The ADA states:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such an individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms conditions, and privileges of employment.

42 U.S.C. § 12112. "The ADA does not, however, erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-a-vis the employee." *Siefken,* 65 F.3d at 666. A plaintiff seeking relief under the ADA must establish that she is a disabled person within the meaning of the ADA, that she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and that she was

terminated because of her disability. *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995).

 Courts have applied the *McDonnell Douglas* scheme of proof to claims brought under several different discrimination statutes. *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir. 1995). Because of their similarity in purpose, when faced with an ADA claim, courts have routinely looked to decisions interpreting the Rehabilitation Act for guidance. Courts have often applied the *McDonnell Douglas* framework to Rehabilitation Act claims. *Id.* at 57–58; *see also Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir.1995); *Pushkin v. Regents of the Univ. of Colorado*, 658 F.2d 1372 (10th Cir.1981). Therefore, it is logical to apply the *McDonnell Douglas* framework to the ADA claim at issue.[4]

 Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of proving a *prima facie* case of discrimination. If the plaintiff meets this burden, the defendant must articulate some legitimate, nondiscriminatory reason for the termination. If the defendant meets this burden of production, the presumption of discrimination created by the *prima facie* case "drops out of the picture," and the plaintiff has the ultimate burden of proving that she has been the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 504–12, 113 S.Ct. 2742, 2746–49, 125 L.Ed.2d 407 (1993). To defeat a motion for summary judgment, the plaintiff must present evidence sufficient for a reasonable jury to conclude that the employer's articulated reason is pretextual by presenting concrete evidence in the form of specific facts that either show that a disability played an impermissible role in the employer's decision or that the proffered nondiscriminatory reasons are unworthy of credence.

**A)** *Prima Facie Case:*

 Generally, a plaintiff establishes a *prima facie* case by proving a set of facts which would enable the fact-finder to conclude that it is more likely than not that the adverse employment action was the product of discrimination. In a case brought under the ADA, a plaintiff may prove a *prima facie* case by showing (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ennis*, 53 F.3d at 58 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)).

Turning to Pouncy's ADA claim, the court notes that with regard to the second element of her prima facie case, there is no dispute that Plaintiff was discharged. Therefore, Plaintiff must merely show the remaining three elements. Initially, Plaintiff must establish that she is a member of the protected class, i.e., a qualified individual with a disability. There are two components to this element; first that Plaintiff is "disabled" and second that she is "qualified".

**1)** *Member of the Protected Class:*

To satisfy the first element of her *prima facie* case, Plaintiff must show that she is a member of the protected class, i.e., she has a disability. The ADA defines disability as follows:[5]

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

---

**4.** As further support for this position, the court notes that the ADA relies upon the enforcement provisions of Title VII. *Americans With Disabilities Act Handbook*, § 1.6 (2d ed. 1991), and the EEOC guidelines adopt the Title VII disparate treatment analysis developed in *McDonnell Douglas* and *Burdine*. 29 C.F.R. pt. 1630 app. § 1630.15(a).

**5.** The ADA defines disability substantially the same as the Rehabilitation Act of 1973 defines handicap, *see* 29 U.S.C. § 706(8)(B), so cases interpreting either will be instructive for this analysis. *See Wooten*, 58 F.3d at 385 n. 2; *Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied*, ─── U.S. ───, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

42 U.S.C. § 12102(2). Pouncy bases her claim on subsection (C).[6] Pouncy claims that she does not actually have an impairment of any kind that substantially limits her life activities, but defendants perceived her as having a mental impairment[7] that substantially limited her major life activity of working.

There is a paucity of caselaw dealing with claims of "perceived disability." However, as with other claims under the ADA, the employer must perceive an impairment, *and* the employer must perceive that the impairment substantially limits a major life activity. *Cook v. Rhode Island,* 10 F.3d 17, 22–23 (1st Cir.1993); *Chandler v. City of Dallas,* 2 F.3d 1385, 1392 (5th Cir.1993). The use of the limiting adjectives "substantial" and "major" indicate that the perceived impairment must be significant. *Wooten,* 58 F.3d at 385. Further, where the plaintiff alleges that the employer perceived her to be substantially limited in the major life activity of working, the plaintiff must show that the employer perceived that the impairment limited employment generally rather than just a particular job. *Byrne v. Board of Educ. School of West Allis,* 979 F.2d 560, 565, 567 (7th Cir.1992).

Pouncy asserts that she was improperly perceived by defendant to have a mental condition which was regarded as substantially impairing her ability to work effectively with others in any job at Vulcan. Pouncy bases this assertion on the fact that Ms. Butcke told defendants that she could not help Pouncy unless Pouncy underwent long-term personal counseling, Ms. Alford's inquiry as to whether Pouncy was obtaining long-term counseling through a company program, Ms. Alford's insistence that Pouncy obtain such counseling to maintain her job, and Mr. Nelson's reference to failed employee counseling sessions in his meeting with other employees in the department following Pouncy's termination.

Given the facts of this case, the court is particularly troubled by the "perceived disability" analysis. The evidence is equally probative of Pouncy's position that the defendants viewed Pouncy as having a mental illness that was interfering with her ability to perform her job as it is of the Vulcan's position that Pouncy merely had poor behavioral traits and performance problems. However, in accordance with summary judgment law, the court will view the evidence in a light most favorable to Pouncy and will assume, for purposes of this motion, that defendants regarded Pouncy as having a mental impairment.[8]

---

**6.** The regulations for the ADA use the following definitions to describe a "perceived disability": (1) the employee has an impairment that does not limit a major life activity, but is treated by the employer as if it does; (2) the employee has an impairment that limits a major life activity only as a result of the attitudes of others; and (3) the employee does not have an impairment, but is treated by the employer as having a substantially limiting impairment. 29 C.F.R. § 1630.2(*l*). Pouncy claims that she falls under the third category because she does not actually have a mental impairment.

**7.** Mental impairment is defined in the ADA regulations as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h).

**8.** The court is troubled with this assumption because of the nature of the "perceived" disability in this case. As noted in the legislative history, the inclusion of "perceived disabilities" within the coverage of the ADA was meant to combat unfounded "myth[s], fear[s] or stereotype[s]" regarding disabilities that frequently prevented

able individuals with disabilities from obtaining employment. 29 C.F.R. Part 1630, App. 1630.2(*l*). However, the regulations are equally clear that individuals with common personality traits such as poor judgment or a quick temper are not considered disabled. *Id.* at 1630.2(h). In the instant case, it is clear that defendant perceived Pouncy as having some behavioral and attitude problems that adversely affected her work. However, because Pouncy was never diagnosed with any mental impairment, and indeed she claims she does not have a mental impairment, it is difficult to attribute her problems to anything other than her personality. The danger of allowing individuals to claim disability on the basis of personality traits not connected with any impairment were explained by the following courts:

In *Clark v. Virginia Bd. of Bar Examiners,* 861 F.Supp. 512 (E.D.Va.1994). Clark claimed that she had a disability that impaired her ability to "concentrate, act decisively, sleep properly, orient [herself], and maintain ordinary social relationships." *Id.* at 513. The court rejected Clark's claim that she had a disability and held that "nothing in the ADA suggests that people

■ However Pouncy has not shown that her perceived impairment limited her employment generally rather than just her particular job. *See Byrne*, 979 F.2d at 565. Even viewing the evidence in a light most favorable to Pouncy, it is clear that defendants only viewed Pouncy's "perceived impairment" as limiting her ability to perform her job as Senior Systems Analyst II. Indeed, Mr. Nelson testified that there were other jobs within Vulcan, particularly in computer operations, that defendants felt Pouncy could perform. (Nelson Depo. at p. 228) However, the manager of that department, Jim Lambert, felt that Pouncy was too disruptive and unpredictable and he would rather not have her in his department. (Nelson Depo. Vol. I at p. 229). Vulcan also had a policy of not transferring employees with performance problems. (Nelson Depo. Vol. II at pp. 96–98). Further, because Pouncy alleges that she in fact does not have any type of mental impairment, there is no indication that any other potential employer would share Vulcan's perception of an impairment, especially since there is no evidence that Vulcan has communicated the circumstances of Pouncy's termination to any potential employer.

Thus, the court finds that because any perceived mental impairment only limited Pouncy's ability to perform her current job, and did not limit her ability to perform a broad range of jobs, Pouncy is not substantially limited in the major life activity of working.

### 2) Performing Job Satisfactorily:

■ Even if it were determined that Pouncy's perceived disability limited her ability to perform a broad range of jobs, she is not a member of the protected class unless she shows that she is a "qualified individual with a disability." The regulations for the ADA provide that a "qualified individual with a disability" is,

> an individual with a disability who satisfies the requisite skill, experience, education *and other job related requirements of the employment position such individual*

suffering from such common difficulties must be singled out for protection under the Act." ... [T]o be a major disability there must be a substantial limitation on a major life activity, and that impairment must be significant ... Impairments that are minor and whose relative severity is widely shared do not fall within the statute's definition. *Id.* at 516 (citations and internal quotations omitted).

The Fourth Circuit has likewise rejected attempts to define disabilities so broadly that they include commonplace conditions such as personality traits. For example, in *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir.1986), the Fourth Circuit stated:

> It would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

*Id.* at 934.

Pouncy's situation is also strikingly similar to that of the plaintiff in *Daley v. Koch*, 892 F.2d 212 (2d Cir.1989). Daley sought employment with the New York City Police Department. As part of the pre-employment process Daley took two psychological profile tests, and a doctor in the Psychological Services Division conducted a screening interview. On the basis of the results of Daley's test and interview, the doctor concluded that the Daley showed poor judgment, irresponsible behavior, and poor impulse control rendering him unsuitable to be a police officer. However, like Pouncy, Daley was not diagnosed with any particular psychological disease or disorder. The Fourth Circuit stated that under such circumstances, Daley's "personality traits could be described as commonplace; they in no way rise to the level of an impairment." *Id.* at 215.

> This Court holds that "poor judgment, irresponsible behavior and poor impulse control" do not amount to a mental condition that congress intended to be considered an impairment which substantially limits a major life activity and therefore a person having those traits or perceived as having those traits cannot be considered a handicapped person within the meaning of the Act.

*Id.* The court is likewise concerned that the true purposes of the Act will be compromised if difficulties such as those described with regard to Pouncy are given statutory protection under the ADA. However, where in this instance, there is evidence that defendants encouraged Pouncy to seek long-term personal counseling and inquired as to whether she had obtained such counseling, the court will assume for purposes of this motion that defendants regarded her as disabled. Without such evidence, however, the court would be inclined to find, as did the courts above, that the problems attributed to Pouncy are nothing more than common personality traits that are not entitled to protection under the ADA.

*holds* or desires, and who, with or without reasonable accommodation *can perform the essential functions of such position.* 29 C.F.R. § 1630.2(m) (emphasis added). This requirement parallels the third element of the *prima facie* case, i.e., the plaintiff was performing her job at a level that met her employer's legitimate expectations at the time of her discharge.

Pouncy asserts that she was meeting or exceeding defendants' expectations from the time of the change in her job in February 1991 until the time of her promotion in 1992. (Crumbley Depo. at pp. 339–40). However, Pouncy does not allege that she was meeting defendants' expectations after her promotion in early 1992 until the time she was terminated, and, there is substantial evidence that prior to her termination Pouncy was having significant performance problems. These problems culminated in the fall of 1992 when Ms. Crumbley and Ms. Alford presented Pouncy with a written document listing the areas in which Pouncy needed to improve to continue working at Vulcan. (Pouncy Depo. at pp. 354–61, 367, 466 DX 12). In addition, there were reports from programmers that they were having to spend more time than necessary to explain changes in the system for someone at Pouncy's level. (Crumbley Depo. at pp. 70–71, 74–77, 116–17). Ms. Crumbley also received reports that Pouncy had a negative attitude towards her peers and noted such in Pouncy's 1989 and 1990 performance reviews. (Crumbley Depo. at pp. 210–24; Pl's Ex. 14).

Thus, the evidence shows that Pouncy was not a qualified individual with a disability because she was unable to satisfy the job related requirements of her position. Therefore, she also failed to satisfy the third element of her prima facie case because she was not performing her job at a level that met her employer's legitimate expectations at the time of her discharge. *See Ennis,* 53 F.3d at 61–62 (evidence in annual performance evaluations and internal memorandum documenting poor job performance established that defendant was not satisfied with plaintiff's performance).

However, even if Pouncy had satisfied the third element, she still must show that her discharge occurred under circumstances that raise a reasonable inference of discrimination.

### 3) Reasonable Inference of Discrimination:

Pouncy has not shown that her discharge occurred under circumstances that would permit an inference of discrimination on the basis of an impermissible factor. As noted above, there is ample evidence that Pouncy was having trouble performing her job. Annual performance appraisals dating back to 1989 document that while Pouncy had good relationships with the users, she had problems with negativism toward her peers and needed to improve her technical knowledge and skills. (Pl's Ex. 14). In addition, there is evidence that Pouncy had trouble accepting and responding appropriately to suggestions for improvement. (Nelson Depo. Vol. I at pp. 48–52, 63–64; Pouncy Depo. at pp. 372–80; Pl's Ex. 14 Evaluation for 1991). As noted above, these problems culminated when Ms. Crumbley and Ms. Alford presented Pouncy with a written document identifying the areas in which Pouncy needed to improve. Vulcan even sent Pouncy to a career counselor in the hopes that the counselor would help her formulate a plan to improve in the areas identified. When Pouncy failed to improve, defendants terminated her employment.

Thus, Pouncy's termination did not occur under circumstances giving rise to a inference of discrimination.

### B) *Articulated Reason for Termination:*

Even assuming that Pouncy has made out a *prima facie* case of discrimination, the Court notes that she has presented no evidence that defendants' articulated reasons for her discharge—poor performance and a bad attitude—were mere pretext for discrimination. Mr. Nelson stated that he told Pouncy of his concerns about her disruptive behavior as early as 1988 when Pouncy was transferred to his department. (Nelson Depo. Vol. II at p. 177). Ms. Alford stated she received complaints about performance when Pouncy's job changed in February of 1992. (Alford Depo. at pp. 41–42, 320–21). To address these problems, Ms. Crumbley

and Ms. Alford presented Pouncy with a written document listing the areas in which Pouncy needed to improve to continue working at Vulcan. Mr. Nelson also met with Pouncy to make sure she understood what she needed to do to keep her job. (Nelson Depo. Vol. I at p. 279; Pouncy Depo. at pp. 365–68).

Thus, certainly by the time she was presented with the written document in September of 1992, Pouncy was on notice that she was not performing up to expectations. Furthermore, by February of 1993, at the time of her annual performance evaluation, Pouncy received a "needs improvement" rating. Defendants nonetheless offered Pouncy continued employment if she could improve her performance and attitude problems.

In light of these undisputed facts, the Court finds that defendants acted in a legitimate and non-discriminatory fashion towards Pouncy. Her performance problems and attitude problems were well documented. Further, the record reveals that defendants went out of their way to attempt to keep Pouncy on the job even after her problems persisted for months.

### C) *Plaintiff's Ultimate Burden of Proof:*

Pouncy has not shown that defendants' articulated reasons for her discharge are merely pretext for disability discrimination, and she has not shown that the reasons are unworthy of credence. As noted several times above, Pouncy's performance problems and attitude problems were noted as far back as her 1989 performance evaluation completed by Ms. Crumbley, well before Pouncy was sent to a career counselor. It is undisputed that problems with a negative attitude towards her peers and the need to develop technical skills were consistently documented from the time of her 1989 performance evaluation until the time of her discharge. Several co-workers and supervisors noted that Pouncy had a long history of a negative attitude.

In addition, Pouncy was not the first employee Mr. Nelson sent to a career counselor.

Mr. Nelson sent Elliot Bell to a career counselor when Mr. Bell was having trouble getting along with other employees which was disruptive to the department. Mr. Bell remains employed with Vulcan in Mr. Nelson's department. In Pouncy's case, however, the career counselor stated that she was unable to help Pouncy address and solve the performance problems noted in the written document given Pouncy by Ms. Alford and Ms. Crumbley.

Pouncy has not presented sufficient evidence to show that defendants' articulated reasons for her discharge, her poor attitude and performance problems, are pretext for disability discrimination. Thus, Vulcan is entitled to judgment in its favor with respect to Pouncy's ADA claim.

### *State Law Invasion of Privacy Claims:*

The tort of invasion of privacy is defined under Alabama law as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering shame or humiliation to a person of ordinary sensibilities. *Carter v. Innisfree Hotel, Inc.,* 661 So.2d 1174, 1178 (Ala.1995). The law prohibits either an intrusion upon a physical space or an invasion of one's own "emotional sanctum." *Id.*

The tort of invasion of privacy consists of four distinct subtorts: (1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of plaintiff's personality for a commercial use. *Phillips v. Smalley Maintenance Services,* 435 So.2d 705, 708 (Ala.1983). There is no evidence that defendants appropriated some element of Plaintiff's personality for a commercial purpose. Likewise, there is no evidence that the comments allegedly made by Ms. Alford and Mr. Nelson were made outside the confines of Vulcan, therefore, Pouncy could not have been subjected to publicity that would violate ordinary decencies or that would create a false image of Pouncy in the public's eye.[9]

9. Liability for each of the three subtorts other than wrongful intrusion requires publication or

commercial use of private information. Although no Alabama cases have defined what con-

The only subtort applicable to the present action is intrusion upon the plaintiff's physical solitude or seclusion. Liability for this type of invasion does not depend on publication. *Id.* at 709. However, the intrusion is actionable only if it would be highly offensive to a reasonable person. *Hogin v. Cottingham,* 533 So.2d 525, 531 (Ala.1988). The "reasonable person" inquiry is a question of law. *Logan v. Sears, Roebuck & Co.,* 466 So.2d 121, 123 (Ala.1985). The court examines three factors when making this determination: (1) whether the subject of the intrusion is information which is private or entitled to be private; (2) the means of intrusion; and (3) the purpose for which the information was obtained. *Hogin,* 533 So.2d at 531. In any case, the court must balance the employer's legitimate business interest in obtaining the information against the intrusion on the employee's privacy resulting from the disclosure.

Ordinarily, an employee has a right to expect that information regarding personal counseling will be private. However, in this instance, Dr. Butcke voluntarily revealed to defendant her opinion that Pouncy could not successfully address her career problems without long-term personal counseling. In addition, Ms. Russell stated that it was her opinion that the inquiry was not inappropriate in this circumstance because of the belief by Ms. Russell and Pouncy's supervisors that counseling would be central to Pouncy's job success. (Russell Depo. at pp. 215–16).[10] Thus, it was not unreasonable for defendants to inquire whether Pouncy was receiving long-term personal counseling, in light of the fact that Dr. Butcke had informed defendant that Pouncy would not be able to perform satisfactorily in her job without such counseling. The court also notes that the means of obtaining the information was not significantly intrusive as Ms. Alford made the inquiry about personal counseling during a private meeting between Ms. Alford and Pouncy in which Pouncy's performance objectives were discussed. Lastly, the purpose for which Ms. Alford asked about personal counseling served a legitimate business concern. As noted, Ms. Butcke had told defendants that Pouncy would not be able to address her job performance problems without personal

stitutes "publicity" for these type claims, the comments to the Restatement (Second) of Torts states that public disclosure "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.... Thus is it not an invasion of the right of privacy ..., to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." Restatement (Second) of Torts § 652D, comment a, at 384–85 (1977).

Applying this standard, several courts have held that when information regarding the psychiatric or medical treatment of the plaintiff is disclosed to a limited number of co-workers, the disclosure does not amount to "publicity" necessary for a invasion of privacy claim. *See Eddy v. Brown,* 715 P.2d 74 (Okla.1986) (disclosure to limited number of co-workers that plaintiff was undergoing psychiatric treatment was not publication); *Wells v. Thomas,* 569 F.Supp. 426, 437 (E.D.Pa.1993) (publication to community of employees at staff meetings is not "publication" required by invasion of privacy cases).

Applying this reasoning to the present case, it is clear that Mr. Nelson's disclosure during a meeting of the people in Pouncy's department that Pouncy had been to a counselor does not satisfy the "publication" element. Neither does Ms. Alford's alleged disclosure of Pouncy's private affairs to other employees qualify as "publi-

cation." The only employee Pouncy alleges Ms. Alford revealed information to is Stacy Lynn. Under the law as stated above, communication to only one employee does not amount to "publication." Furthermore, the speaker phone incident does not qualify as "publication" for the same reason. Only Pouncy's supervisors and Ms. Hendrix heard the call. There is no evidence that anyone else heard the conversation. Thus, Pouncy cannot recover under any of the three subtorts requiring publication.

The case of *Schrimsher v. Liberty National Life Ins. Co.,* 655 So.2d 986 (Ala.1995) cited by Pouncy is not applicable. *Schrimsher* involved allegations of false and defamatory statements about Schrimsher made to his co-employees. There is no allegation that the statements made about Pouncy were false or defamatory. Further, the *Schrimsher* court reaffirmed that " 'communications among employees in the course of transacting the company's business and in the proper scope of the employee's duties do not constitute a publication.' " *Id.*

10. Pouncy claims that Dr. Butcke did not tell her she needed long-term personal counseling. However, it is undisputed that Dr. Butcke told defendants that Pouncy needed long term counseling. Therefore, it was not unreasonable for defendants to assume that Dr. Butcke had told Pouncy as well.

counseling. Defendants had a legitimate interest in determining whether Pouncy would be able to improve her job performance, and it is clear that the question regarding counseling was made only in furtherance of this valid business objective. Therefore, the court finds that under the facts of this case, Ms. Alford's inquiry regarding personal counseling was not an unreasonable interference with Pouncy's privacy.

*Intentional Interference with Business Relations:*

■ The elements of a prima facie case of intentional interference with business or contractual relations are: (1) the existence of a contract or business relation; (2) defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the interference.

■ Neither a party to the contract nor an agent or employee of a party to the contract, if acting within the scope of authority, can be liable for tortious interference with the contract. *See Hickman v. Winston County Hosp.,* 508 So.2d 237, 239–40 (Ala. 1987); *Lolley v. Howell,* 504 So.2d 253, 255–56 (Ala.1987). Thus, neither Vulcan nor the individual defendants can be liable for this claim.

■ As to the phone call to Ms. Alford made by Documented Reference Check, an agency hired by Pouncy, there is also no interference with a contract or business relation. The law requires an existing contractu-al or business relation with a third party before there can be interference with that relation. *Bush v. Goldman Sachs & Co.,* 544 So.2d 873 (Ala.1989). The undisputed evidence shows that Pouncy was not a job applicant with the agency and the call was not made to provide information to a prospective employer. Further, there is no evidence that Vulcan disclosed the circumstances of Pouncy's discharge to any prospective employers. Thus, there was no relationship with which defendants could have interfered, and defendants are entitled to a judgment in their favor with respect to this claim.

*Conclusion*

In sum, for the reasons stated above, the individual defendants, Mr. Nelson and Ms. Alford, are entitled to a judgment in their favor with respect to the ADEA and ADA claims because they are not Pouncy's employer. Vulcan is also entitled to judgment in its favor on Pouncy's ADA claim. Lastly, all defendants are entitled to a judgment in their favor on Pouncy's state law tort claims for invasion of privacy and interference with business or contractual relations. Thus, the only claim remaining in this action will be Pouncy's ADEA claim against Vulcan. A separate order in accordance with this memorandum of decision will be entered.