**James STEDMAN Plaintiff,**

v.

**BIZMART, INC., a corporation, Defendant.**

**CV–01–H–1675–S.**

United States District Court,
N.D. Alabama,
Southern Division.

Sept. 3, 2002.

John M. Aaron, Aaron & Dunn LLC, Birmingham, AL, for plaintiff.

Carol S. Nelson, Shannon L. Miller, Constangy Brooks & Smith, Birmingham, AL, for defendant.

HANCOCK, Senior District Judge.

## MEMORANDUM OF DECISION

The Court has before it the June 28, 2002 motion of defendant Bizmart, Inc. for summary judgment. Pursuant to the Court's July 1, 2002 order, the motion was deemed submitted, without oral argument, on July 29, 2002.

### I.  Procedural History

Plaintiff James Stedman commenced this action on July 3, 2001 by filing a complaint in this Court alleging violations of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.* Plaintiff contended that defendant's alleged conduct constitutes (1) creation of a hostile work environment and (2) constructive discharge.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted evidence [1] in support of its own motion for

---

1.  Defendant submitted: excerpts from both depositions of James Stedman with attached exhibits; excerpts from the deposition of Kevin Lane with attached exhibits; excerpts from the deposition of Lisa Milano; affidavit of Kevin Lane; and affidavit of Lisa Milano; unemployment compensation decision.

summary judgment and filed a supporting brief on June 28, 2002. On July 22, 2002 plaintiff filed evidence[2] in opposition to defendant's motion for summary judgment. On July 29, 2002 plaintiff filed a brief in response to defendant's motion for summary judgment.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir.2000) The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324, 106 S.Ct. 2548.

The substantive law will identify which facts are material and which are irrelevant. *See Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir.1991) (*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving

---

**2.** Plaintiff submitted: the deposition of Kevin Lane; the second deposition of Jim Stedman; the deposition of Lisa Milano with attached exhibits; statement by Kevin Lane regarding 11/13/00; statement by Kevin Lane regarding 12/5/00; 10/27/00 rebuttal of performance review; 12/11/00 letter from James Stedman; 10/31/00 e-mail from Joseph Grimsic; 10/30/00 PowerMax III engineering report; 11/9/00 e-mail from Jim Stedman; 11/15/00 e-mail from Tonja Milkovich; 07/17/00 e-mail from Robert McGonagle; 11/15/00 e-mail from Jim Stedman; and 10/23/00 e-mail from Robert Thomas.

party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citing *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

### III. Relevant Undisputed Facts[3]

Defendant, Bizmart, Inc. is a wholly owned subsidiary of OfficeMax. (*See* Lane Aff. ¶ 2.) OfficeMax is a retail discount superstore chain that sells office supplies, business electronics, software accessories and office furniture. (*See id.*) Defendant hired plaintiff on March 27, 2000 as an industrial engineer for its distribution facility in McCalla, Alabama. (*See* Stedman Dep. Vol I at 6, 12, 15.) This facility was not complete when he was first hired; as a result, plaintiff trained for a short period at another OfficeMax distribution facility in Hazelton, Pennsylvania. (*See* Stedman Dep. Vol. II at 15–16.) Plaintiff reported to the McCalla facility in June of 2000 where Kevin Lane was his immediate supervisor.[4] (*See id.* at 48–49.) Plaintiff also reported to the Director of Logistics Industrial Engineering, Thom Rogers, who worked at corporate headquarters in Ohio. (*See id.* at 48–49.) Plaintiff's primary job responsibilities were overseeing the completion of construction and the slotting of products.[5] (*See id.* at 82–83; Lane Dep. at 26, 41, 84.)

Plaintiff was diagnosed with diabetes in 1998 as a result of his October 31, 1996 liver transplant and the medications he is required to take to keep his body from rejecting the organ. (*See* Stedman Dep. Vol. II at 51, 64–65.) He takes medicine for his diabetes but does not have to ad-

---

3. Facts are undisputed unless otherwise expressly noted. Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff. *See Fitzpatrick*, 2 F.3d at 1115.

4. Kevin Lane was hired shortly after plaintiff but Lane was plaintiff's only immediate supervisor while at the McCalla facility. (*See* Stedman Dep. Vol. II at 48–49.)

5. Slotting of products is the computerized determination of where merchandise will be unloaded and how it will flow through the distribution center to be shipped to OfficeMax stores. (*See* Lane Dep. at 43–45, 98.) Through slotting the warehouse management computer system electronically receives product, informs how the product is to be stored, pulled from inventory and shipped. (*See* Stedman Dep. Vol. II at 13; Lane Dep. at 59–60.)

minister shots to himself for his condition. (*See id.* at 51–52.) Plaintiff was diagnosed with job stress in September 2000 and was given medication for both job stress and depression. (*See id.* at 53–54.) Plaintiff was first diagnosed with depression when he was eighteen years of age, after which time he was treated at an inpatient facility. (*See id.* at 54–55.) After being released from this facility, plaintiff was not treated for depression again until the late 1970's when he saw a psychiatrist who provided him with therapy for depression. (*See id.* at 56–60.) In addition, plaintiff was diagnosed with problems with mental functioning in 2001 [6] after he left his employment with OfficeMax. (*See id.* at 62–63.)

When first hired by OfficeMax, plaintiff informed Human Resources Manager Lisa Milano that he was a liver transplant recipient.[7] (*See id.* at 70–71.) Plaintiff also informed Joe Desmond and Thom Rogers of his condition. (*See id.* at 69, 72.) Additionally, according to plaintiff, shortly after Kevin Lane came to OfficeMax, plaintiff informed Lane that he was a liver transplant recipient and diabetic in the event a paramedic was ever called to the facility. (*See id.* at 68–69.) Plaintiff testified that Lane responded with "we're not going to worry about that" and walked away.[8] (*See id.* at 70.) At the time plaintiff informed Lane of his diabetic condition and transplant status, however, plaintiff did not re-quire any accommodation to perform the essential functions of his job. (*See id.* at 72–73; Ex. 8 to Stedman Dep.)

In September of 2000 the expectations of Kevin Lane and plaintiff's work volume became greater than plaintiff could perform. (*See* Stedman Dep. Vol. II at 10–11, 20–22, 73–74.) These expectations included finding and correcting errors in the data warehouse management computer system and other tasks that plaintiff believed were more systems-oriented as opposed to traditional industrial engineering tasks. (*See id.* at 10–13, 81–82, 85.) When plaintiff asked Lane about performing what plaintiff believed were more traditional tasks, Lane told plaintiff that they needed to have the warehouse computer system data in the facility first straightened out. (*See id.* at 86–87.) However, this data was never straightened out during plaintiff's employment. (*See id.* at 87.)

At some point in his employment,[9] Plaintiff claims that he told Lane that he felt overwhelmed by his job. (*See id.* at 73–74.) During this conversation, however, plaintiff did not bring up any alleged disability. (*See id.* at 74.) Plaintiff further testified that he asked Lane for some assistance and Lane provided plaintiff with a temporary employee to assist him.[10] (*See id.* at 75.)

---

**6.** The mental functioning problem is related to the liver transplant plaintiff received in October of 1996. (*See* Stedman Dep. Vol. II at 64–65.)

**7.** Plaintiff testified that he informed Ms. Milano at a restaurant in Hazelton, Pennsylvania, that he was not allowed to drink because he was a liver transplant recipient. (*See* Stedman Dep. at 70–71.)

**8.** Kevin Lane denies having this conversation and claims that he learned of plaintiff's liver transplant through a conversation with Lisa Milano. (*See* Lane Dep. at 133.)

**9.** Plaintiff testified that he cannot remember when he had this conversation with Lane. (*See* Stedman Dep. Vol. II at 73–74.)

**10.** Some disagreement exists regarding the identity of this person. Plaintiff testified that a temporary employee did assist him for a while, but he could not remember his full name at the time of his deposition. (*See* Stedman Dep. Vol. II at 76.) However, in his brief, plaintiff's attorney disputes the fact that defendant provided plaintiff with any assistance. (*See* Pl. brief at 6.)

In late September of 2000 plaintiff experienced chest pains at work and drove himself to the hospital where he was admitted for stress related complications. (*See id.* at 171.) He was off of work for one week due to stress. (*See* Milano Dep. at 29–30.) After plaintiff returned from this leave, plaintiff claims that Lane asked him to step down from his job and informed plaintiff that Lane "was not going to be responsible for affecting someone's health." (*See* Stedman Dep. Vol. II at 93–96.) Plaintiff informed Lane that he could handle his job as industrial engineer and he was not interested in stepping down, but he was open minded to other positions.[11] (*See id.* at 95–96.)

Plaintiff testified at his deposition that he seldom had direct contact with Lane and that he learned of Lane's job performance expectations in staff meetings or when Lane would stop by his office to ask plaintiff questions. (*See* Stedman Dep. Vol. II at 24.) Plaintiff recounted times when Lane "harassed" and "threatened" him by asking plaintiff in front of a group of employees the answer to a question and showing disgust if plaintiff did not know the answer and that Lane stopped by plaintiff's office and asked in a loud voice whether plaintiff had completed certain projects. (*See id.* at 87–92; Ex. 9 to Stedman Dep.) Plaintiff also stated that Lane once timed him on his ability to finish a computer system entry. (*See* Stedman Dep. Vol. II at 88–89.) Additionally, plaintiff testified that Lane insensitively inquired about plaintiff's stepmother after

she passed away and asked plaintiff to work the Saturday following her death.[12] (*See id.* at 172–73.)

In October of 2000 plaintiff received a "below expectations" rating on his midyear Performance Evaluation, covering his job performance from April to September of 2000. (*See id.* at 122; Ex. 11 to Stedman Dep.) The comments on this evaluation reflected Lane's belief of plaintiff's continued lack of understanding of the slotting process.[13] (*See* Lane Aff. ¶ 7.) Plaintiff informed Human Resource Director Lisa Milano that he was shocked by the low rating on the evaluation and did not agree with it. (*See* Stedman Dep. Vol. II at 102–04.)

Following this evaluation, Lane issued Plaintiff a Performance Counseling on November 3, 2000 that addressed several of plaintiff's continued performance problems. (*See* Stedman Dep. Vol. II at 123; Ex. 13 to Stedman Dep.) These continued performance problems primarily concerned plaintiff's difficulty with the slotting process. (*See* Ex. 13 to Stedman Dep.) Lane attached a list of specific tasks for plaintiff to focus on mastering as well as expected completion times for the tasks. (*See id.*) Lane claims that he issued this Performance Counseling in an effort to correct plaintiff's performance problems and expected to see immediate improvement. (*See* Lane Dep. at 175–178.) Plaintiff again complained to Milano and told her he thought that the counseling was unfair. (*See* Stedman Dep. Vol. II at 105–06.) He also submitted a rebuttal to his

---

**11.** Lane denies ever having this conversation with plaintiff. (*See* Lane Dep. at 137–39.)

**12.** Plaintiff did not attend his step-mother's funeral and did not request any time off or request not to work on the Saturday following her death. (*See* Stedman Dep. Vol. II at 171–74.)

**13.** The comments on the evaluation included: "slotting strategies are not fully understood

.... still revisiting these strategies in late September"; "Jim is challenged to provide 'timely' internal customer service support. Some of this is due to a lack of system knowledge/understanding"; and "Jim tries to respond with a sense of urgency, but lacks the system understanding to respond in a timely manner." (Ex. 11 to Stedman Dep.)

October mid-year Performance Evaluation and this Performance Counseling on November 7, 2000. (*See id.* at 106–07, 122–23; Ex. 12 to Stedman Dep.)

Plaintiff's performance problems did not immediately improve, and on November 21, 2000 plaintiff received a second Performance Counseling. (*See id.* at 129–30; Ex. 17 to Stedman Dep.) Plaintiff disagreed with this counseling and maintained that Lane was "nitpicking" and "micromanaging."[14] (*See* Stedman Dep. Vol. II at 130–135.) After plaintiff received this second Performance Counseling, he again went to Lisa Milano and told her that he considered the counseling "for lack of a better word, harassment." (*See id.* at 111–12.)

In December 2000 plaintiff learned of a job opening for a clerical position in the receiving department. (*See* Stedman Dep. Vol. II at 26–27.) Plaintiff then went and asked the manager of the receiving department how he felt about plaintiff working for him, and the manager informed plaintiff that he would be pleased to have plaintiff work in that department. (*See id.* at 27, 31, 97.) Plaintiff also informed Lane and Milano that he was interested in stepping down to the job of receiving clerk. (*See id.* at 28, 30–31; Lane Dep. at 199–02; Milano Dep. at 50–51.) Lane asked plaintiff if he was aware that the pay difference would be from $50,000 to approximately $18,000 in the clerical position. (*See* Stedman Dep. Vol. II at 29–30.) After plaintiff informed Lane that he was aware of the pay difference, Lane told plaintiff that he would check with "Corporate" about this possibility and get back with plaintiff at a later time. (*See id.* at 29.)

On December 11, 2000 Lane followed up on this conversation, and plaintiff voluntarily signed a letter providing that he wanted to be relieved of his responsibilities as industrial engineer because he felt that he could not meet the requirements of the position. (*See id.* at 32–33; Ex. 7 to Stedman Dep.) He requested a reassignment to the position of receiving clerk with an acknowledgment of the decrease in pay. (*See id.*) Both Lane and Milano told plaintiff that he would remain in his present job as an industrial engineer until OfficeMax found a replacement for him; after a replacement was found, he would then move to the clerical job in the receiving department. (*See* Stedman Dep. Vol. II at 36; Lane Dep. at 203–04; Milano Dep. at 54.) After plaintiff made the December 11, 2000 request, OfficeMax began searching for plaintiff's replacement. (*See* Stedman Dep. Vol. II at 181; Milano Dep. at 54–55.)

Plaintiff quit his job on January 4, 2001. (*See* Stedman Dep. Vol. II at 36–37.) That morning, Lane called plaintiff into his office and questioned plaintiff about his failure to work the preceding Saturday. (*See id.* at 37–38; Lane Dep. at 206–209.) He told plaintiff that he was not a team player and informed him that as long as he was receiving pay to perform the job of industrial engineer, Lane expected plaintiff to perform all of the job's duties. (*See id.*)

Later that morning, plaintiff interrupted Lisa Milano and informed her that "I've had all I can take." (*See* Stedman Dep. Vol. II at 37; Milano Dep. at 55–56.) Milano asked plaintiff if he was sure he wanted to quit and tried to persuade him to walk around the block or take a drive to calm down. (*See* Stedman Dep. Vol. II at 39–40; Milano Dep. at 62–63.) Plaintiff refused, packed up his personal belongings and left. (*See* Stedman Dep. Vol. II at 41.)

Plaintiff applied for Social Security disability benefits in May of 2001 and is currently receiving these benefits. (*See* Sted-

---

14. According to Plaintiff, other employees agreed with him that Lane was unreasonable in his expectations of all of the employees he supervised. (*See* Stedman Dep. Vol. II at 116–19.)

man Dep. Vol. I at 13–15; Ex. 2–3 to Stedman Dep.) Plaintiff indicated in his application for disability benefits that he became unable to work because of his disabling condition on January 4, 2001; however, plaintiff testified at his deposition that he believed that he was disabled before this date. (*See* Stedman Dep. Vol. I at 14–15; Ex. 2 to Stedman Dep.)

Plaintiff noted in a questionnaire provided to the Social Security Administration that he began having problems in September of 2000 and that he "had quit [his employment] because of depression and forgetfulness." (*See* Stedman Dep. Vol. I at 16–19; Ex. 4 to Stedman Dep.) Plaintiff also claims that he experienced hand tremors which at times prevented him from typing, one of his job duties as an industrial engineer. (*See* Stedman Dep. Vol. I at 19–21.) In the questionnaire, plaintiff indicated that he was able to care for his personal needs without assistance, that he shops for his personal needs, vacuums, washes dishes and mops, and cares for the dog. (*See* Ex. 4 to Stedman Dep.) Additionally, plaintiff provided "I don't comprehend what I hear or read without having to go over something a couple of times or more." (*See id.*)

In another form completed as part of his application for Social Security disability benefits, plaintiff provided that he "had quit his job due to problems with memory and shakes … could not process daily job information." (*See* Stedman Dep. Vol. I at 22–23; Ex. 5 to Stedman Dep.) Plaintiff explained that while at work he would often not know what task to perform next, that he would almost immediately forget what someone at work said, and that by eleven o'clock in the morning he was "burned out" from work. (*See* Stedman Dep. Vol. I at 23–24.) Plaintiff stated that he stopped working because he "could not focus or retain job duties assignments." (*See id.* at 25–26; Ex. 5 to Stedman Dep.)

On January 9, 2001 plaintiff filed a charge of discrimination with the EEOC alleging age [15] and disability discrimination. (*See* Stedman Dep. Vol II at 47; Ex. 8 to Stedman Dep.) The EEOC issued a Dismissal and Notice of Right to Sue on April 4, 2001 (*See* Pl.'s October 15, 2001 Evidentiary Submission.) Plaintiff then filed this lawsuit on July 3, 2001 alleging that OfficeMax subjected him to a hostile work environment and constructively discharged him in violation of the American with Disabilities Act. (*See* Stedman Dep. Vol. II at 9–10, 119–121, 195–196.)

## IV. Applicable Substantive Law and Analysis

### A. Hostile Work Environment Claim [16]

Plaintiff claims that he was harassed because of his disability in violation of the ADA. A claim for harassment based on disability, like one under Title VII, re-

---

**15.** Plaintiff, apparently, decided not to pursue the age discrimination claim alleged in the charge of discrimination to the EEOC.

**16.** The Supreme Court has not expressly upheld a claim for hostile work environment under the ADA. The Third Circuit, however, did accept such a claim. *See Fox v. Gen. Motors Corp.,* 247 F.3d 169, 175–76 (4th Cir. 2001). Other courts have proceeded on the assumption that the ADA creates a cause of action for a hostile work environment but avoided confirming that the claim exists. *See, e.g., Walton v. Mental Health Ass'n. of Southeastern Pennsylvania,* 168 F.3d 661, 666–67

(3d Cir.1999) ("we will assume this cause of action without confirming it because [plaintiff] did not show that she can state a claim."); *Wallin v. Minnesota Dep't. of Corrections,* 153 F.3d 681, 687–88 (8th Cir.1998) ("We will assume, without deciding, that such a cause of action exists."); *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998) (noting that various district courts have assumed the claim's existence and assuming its existence in order to dispense with appeal but stating that "[t]his case should not be cited for the proposition that the Fifth Circuit recognizes or rejects an ADA cause of action based on hostile environment harass-

quires a showing that: (1) plaintiff belongs to a protected class; (2) he was subject to unwelcome conduct; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)).

### 1. Protected Class—Actual or Perceived Disability

■ Plaintiff claims defendant created a hostile work environment because of his disability under 42 U.S.C. § 12101, *et. seq.*, the ADA. Plaintiff, therefore, has the burden of demonstrating that he belongs to the class of persons protected by the ADA. The ADA prohibits employers from discriminating against a "qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112. To be a member of the protected class, plaintiff must have a "disability." The statute defines "disability" as one of the following: "(A) a physical or mental impairment that substantially limits one of more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In his brief, plaintiff argues that he is disabled under

the first and third prong: he has a physical impairment that substantially limits one or more of his major life activities and/or defendant regarded him as having a disability.[17]

Prior to January 2002, case law made satisfaction of a *prima facie* case under the ADA, particularly meeting the "disability" prong, relatively simple. On January 8, 2002, however, the Supreme Court significantly altered the definition of "substantially limits a major life activity." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

In *Toyota* the Supreme Court reversed the Sixth Circuit decision that found a former employee disabled because she could no longer perform all her manual tasks at work due to carpal tunnel syndrom. *See Toyota*, 534 U.S. at ——, 122 S.Ct. at 689. Curtailing previous case law defining "major life activities," the Court held that "to be substantially limiting in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* 122 S.Ct. at 691. Specifically, the Court stated that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives,[18] not

---

ment."). Although the Eleventh Circuit has not directly addressed the issue, district courts faced with claims of disability harassment under the ADA have accepted such claims. *See, e.g., Johnston v. Henderson*, 144 F.Supp.2d 1341, 1360–61 (S.D.Fla.2001); *Bryant v. Compass Bank*, 1996 WL 529214 (N.D.Ala. May 31, 1996).

The parties have assumed that such a claim exists and the court will proceed on this assumption applying the same elements of proof as applied to Title VII cases.

**17.** In his complaint, plaintiff also argues he is disabled under the second prong but did not argue this in his brief. Notwithstanding this deficiency, plaintiff has not produced any evidence or any record that classifies or misclassifies him as having an impairment that substantially limits a major life activity. *See Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1229 (11th Cir.1999).

**18.** The Court noted that testimony that the *Toyota* plaintiff could brush her teeth, wash her face, bathe, tend her garden, fix breakfast, do laundry, and pick up around the house

whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 693.

As a result, this decision creates additional obstacles for many plaintiffs in disability cases, particularly those alleging discrimination in the workplace. Under *Toyota* it appears that courts now have greater discretion in determining what is a major life activity and what interference with that activity is substantial enough to constitute a disability.

Plaintiff cannot make out a *prima facie* case under the ADA because he has not produced evidence that satisfies the burden he bears of showing that he is in the class of persons protected by the ADA, i.e., a "disabled" person under *Toyota*. Plaintiff has not produced any evidence that his diabetes impeded his activities outside of the workplace in any way. For example, plaintiff has not produced evidence that he cannot perform the type of manual tasks of central importance to daily life, such as brush his teeth, wash his face, fix breakfast, do laundry, and the like. More importantly, in plaintiff's daily activities questionnaire that he completed for his Social Security disability application, plaintiff unequivocally states that his diabetes did not impede his activities outside the workplace. (*See* Ex. 4 to Stedman Dep. at 1–4.) Plaintiff stated that he cares for his personal needs, including grooming, bathing, and dressing. (*See id.* at 1.) He shops for his personal needs, vacuums, washes dishes, mops, and cares for the dog. (*See id.* at 2–3.)

As plaintiff admits that his diabetic condition does not inhibit his major life activities outside his job, the only possible major

life activity as to which plaintiff could claim a substantial limitation is the life activity of working. In analyzing such a disability claim, the Supreme Court has instructed that "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs." *Sutton v. United Air Lines*, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Although the *Sutton* plaintiffs alleged that their employer regarded their impairment as preventing them from working as global airline pilots, the Court held that disqualification from working in a single job does not support the claim that a plaintiff has a substantially limiting impairment. *See id.* at 493, 119 S.Ct. 2139.

In order to prevail, therefore, plaintiff must prove that his diabetes precluded him from a broad range of jobs. *See id.* at 491, 119 S.Ct. 2139; *see also Pritchard v. Southern Co. Serv.*, 92 F.3d 1130, 1133 (11th Cir.1996) (stating "nor does the inability to perform a single, particular job ... constitute a substantial limitation in the major life activity of working"). He has come forward with no such proof. Indeed, by his own testimony, plaintiff cannot meet this standard. Plaintiff testified that he believed he could perform the job of receiving clerk. (*See* Stedman Dep. Vol. II at 181–83.) This testimony indicates that plaintiff's impairment only precluded him from performing his particular job as an industrial engineer.[19] Under the Supreme Court's holding in *Sutton*, this evidence is insufficient to invoke the protection of the ADA.

---

was the very type of evidence the Sixth Circuit should have focused on, as these seemed the type of manual tasks of central importance to people's daily lives. *See Toyota* 122 S.Ct. at 693.

**19.** Additionally, on December 11, 2000 plaintiff signed a letter stating that he could not meet the requirements of the position as industrial engineer and requesting that he be considered for the position of receiving clerk. (*See* Ex. 7 to Stedman Dep. Vol. II.)

■ The fact that plaintiff attempts to bring his claim within the ADA's ambit by arguing that he satisfies the "regarded as" prong does not alter the preceding analysis. The court recognizes that "[a]s with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of an individual." *Hilburn v. Murata Electronics NA, Inc.*, 181 F.3d 1220, 1230 (11th Cir.1999) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir.1998)). At best, plaintiff's only evidence that defendant regarded him as substantially impaired in major life activity pertains to the life activity of working.

To show that he was regarded as substantially limited in his ability to work, plaintiff must "prove that [defendant] considered [him] as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training, skills and abilities.'" *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir.2000). Plaintiff's only evidence that defendant regarded him as disabled is Lane's sole comment to plaintiff that "he didn't want to be responsible for affecting someone's health." (Stedman Dep. Vol. II at 93-96.) Plaintiff does not explain how this proves that his employer regarded him as disabled under the ADA. OfficeMax agreed to transfer plaintiff to the receiving clerk position three weeks before he quit his job. (*See id.* at 35-36; Ex. 7 to Stedman Dep.) In addition, plaintiff testified that Lane never made reference to the fact that plaintiff was diabetic or a liver transplant recipient while talking about his job performance. (*See* Stedman Dep. Vol. II at 93.) Therefore, under the Eleventh Circuits holdings, plaintiff cannot establish that his employer regarded him as substantially impaired in major life activity.

For the foregoing reasons, plaintiff has failed to establish the first element of a prima facie case under the ADA by failing to come forward with evidence demonstrating that he is in the class of persons protected by the ADA.

## 2. Severe and Pervasive

■ Even assuming that plaintiff was harassed on the basis of a disability or perceived disability, plaintiff has not produced evidence sufficient to demonstrate that any harassment he faced was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *See Gupta*, 212 F.3d at 582–83. This requirement tests the legitimacy of most harassment claims and is therefore regarded as crucial. *See id.* at 583 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The "'mere utterance of an ... epithet which engenders offensive feelings of an employee' ... does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe to alter the conditions of the employment and create an abusive working environment'" is the law violated. *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (quoting *Meritor*, 477 U.S. at 65–66, 106 S.Ct. 2399).

Accordingly, in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment, the employee must meet both a subjective and objective test. *See Mendoza*, 195 F.3d at 1246. The employee must establish not only that he subjectively perceived the environment as hostile, but also that a reasonable person would perceive the environment to be hostile and abusive. *Watkins v. Bowden*,

105 F.3d 1344, 1355–56 (11th Cir.1997). The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all the circumstances. *Id. See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Although the court examines the statements and conduct complained of collectively in determining whether they were sufficiently pervasive or severe to constitute disability harassment, the statements or conduct must be related to plaintiff's disability or perceived disability. *See Gupta,* 212 F.3d at 583 (stating in sexual harassment cases "the statements and conduct must be of a sexual or gender-related nature ... before they are considered in determining whether the severe or pervasive requirement is met.") Isolated and innocuous incidents, even if intentional, will not support a hostile environment claim and are not counted. *See id.*

Plaintiff claims that Lane "harassed" and "threatened" him in front of a group of employees by asking plaintiff a question and showing disgust when plaintiff did not know the answer and stopping by plaintiff's office and asking in a loud voice if plaintiff had completed certain projects. (*See* Stedman Dep. Vol. II at 87–92; Ex. 9 to Stedman Dep.) Plaintiff additionally claims that Lane once timed plaintiff on his ability to finish a computer system entry. (*See id.* at 88–89.) There is no evidence suggesting that this conduct, although upsetting to plaintiff, related in any way to plaintiff's claimed disability so as to fall in the category of disability-harassing behavior. Further, even if there were such evidence, this conduct falls far, far short of that required to satisfy the "severe or pervasive" element.

The only comment that is even arguably related to plaintiff's disability is Lane's comment that he was not "going to be responsible for affecting somebody's health." (*See* Stedman Dep. Vol. II at 93–96.) This comment, standing alone or considered along with all other evidence, does not establish that the harassing conduct was sufficiently severe or pervasive to alter the plaintiff's terms or conditions of employment. Thus, plaintiff also has failed to establish a *prima facie* case by failing in his burden to produce evidence that any harassment he faced was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *See Gupta,* 212 F.3d at 582–83.

### 3. Inconsistencies in his ADA claim and Social Security disability claim.

An applicant for Social Security disability benefits must establish that he is disabled under the Social Security Act and thus "not only unable to do his previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). However, under the ADA, a plaintiff must establish that he is a "qualified individual with a disability" who is unable to "perform the essential functions" of his job "with or without a reasonable accommodation" from his employer. 42 U.S.C. § 12111(8). At first glance, a claim of total disability under Social Security Disability Insurance ("SSDI") might seem fundamentally inconsistent with status as a qualified individual under the ADA; however, a plaintiff may declare that he was totally disabled in his SSDI application and then declare that he was a qualified individual under the ADA if he shows that this apparent inconsistency can be resolved. *See Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The Supreme Court held that though filing an application for Social Security disability

benefits does not necessarily preclude a plaintiff from bringing an ADA claim, the plaintiff must proffer a sufficient explanation of any apparent inconsistencies between the ADA claim and sworn statements made in an application for disability benefits. *See id.*

Plaintiff argues that his claim of disability in his application for SSDI benefits does not preclude him from establishing that he was a qualified individual under the ADA. He also contends that the disability application did not take into account the prospect of accommodation as contemplated under the ADA. Plaintiff testified in his deposition that he filed for Social Security benefits in May of 2001. (See Stedman Dep. Vol. I at 13–15; Ex. 2–5 of Stedman Dep.) Plaintiff further testified that he currently receives monthly disability payments. (*See* Stedman Dep. Vol. II at 9.) In addition, plaintiff testified that he believed that he became disabled in September of 2000.[20] In his SSDI application Stedman swore that he was disabled and unable to work. (*See* Ex. 2 to Stedman Dep.) Stedman now claims, however, that he was able to work during the time that he was employed at OfficeMax. This statement clearly contradicts his claim of disability in his SSDI application. Plaintiff has failed to present a sufficient explanation of the contradiction between his statement before the SSA and his statements in connection with his ADA claim.

For each of the foregoing reasons, separately, defendant is entitled to summary judgment on plaintiff's hostile work environment ADA claim.

### B. Constructive Discharge Claim

In addition to his claim of hostile work environment, plaintiff alleges that defendant constructively discharged him on the basis of his disability. After discussing in section IV.A.1., *supra,* plaintiff's hostile work environment claim, the court concluded that claim failed because plaintiff has not shown himself to be in the ADA protected class. His ADA constructive discharge claim fails for the same reason. But the constructive discharge claim also fails for an additional independent reason. "The threshold for establishing constructive discharge ... is quite high." *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir.2001). To establish constructive discharge, plaintiff must prove that working conditions were "so intolerable that a reasonable person in [his] position would have been compelled to resign." *Griffin v. GTE Florida, Inc.,* 182 F.3d 1279, 1283 (11th Cir.1999). Moreover, "the standard for proving constructive discharge is higher than the standard for proving a hostile work environment claim." *Hipp,* 252 F.3d at 1231 (citing *Landgraf v. USI Film Prods.,* 968 F.2d 427, 430 (5th Cir.1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum requirement to prove a hostile working environment.")).

In assessing a constructive discharge claim, the plaintiff's subjective feelings about his employer are not considered. *See Hipp,* 252 F.3d at 1231. Rather, the court employs an objective standard: whether a reasonable person in the plaintiff's position would have been compelled to resign. *See Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1450 (11th Cir.1998). A plaintiff "must show more than the working conditions were not to [his] liking; [he] must prove that the alleged intolera-

---

**20.** His SSDI application indicates that he became unable to work because of his disabling condition as of January 4, 2001. Plaintiff testified, however, that "they set that date because that was the last day I worked" but that he considered himself disabled before that date. (*See* Stedman Dep. Vol. I at 15–17.)

bility of working conditions resulted from acts of discrimination." *Schwertfager v. City of Boynton Beach,* 42 F.Supp.2d 1347, 1367 (S.D.Fla.1999); *Carr v. Cohen,* 44 F.Supp.2d 1240, 1246 (M.D.Ala.1999) (holding that to succeed on constructive claim, plaintiff must show both that the employer's actions were impermissibly motivated and that these actions made plaintiff's working conditions so intolerable that her resignation is deemed involuntary).

 Plaintiff is unable to meet this rigorous standard. Plaintiff maintains that he was forced to resign, but offers no objective basis for this subjective belief. Plaintiff's testimony clarifies that the essence of his constructive discharge claim is the stress he experienced performing his job duties and working under his supervisor, Kevin Lane.[21] The court concludes that these conditions were not so intolerable as to force a reasonable person to resign, hence, falling far short of the required threshold. Therefore defendant is entitled to summary judgment in its favor on plaintiff's constructive discharge claim.

In summary, the Court finds that no material issues of fact remain and that defendant Bizmart, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff. A separate order will be entered.

### FINAL ORDER GRANTING SUMMARY JUDGMENT

In accordance with the memorandum of decision this day entered, there being no genuine issue of material facts, defendant's motion for summary judgment is **GRANTED.** It is hereby **ORDERED, ADJUDGED, and DECREED** that final judgment be entered in favor of defendant Bizmart, Inc. as to all of plaintiff's claims. Costs are taxed against plaintiff.

---

21. Additionally, the court notes plaintiff's statements in his application for Social Security disability benefits indicate that plaintiff quit because of medical reasons that did not subside after leaving his job at OfficeMax (*See* Stedman Dep. Vol. I at 16–19; Ex. 4 to Stedman Dep.)