Louis E. GALLUPS, Plaintiff,

v.

**CITY OF ALEXANDER CITY,
Alabama, Defendant.**

Civil Action No. 01–F–1411–E.

United States District Court,
M.D. Alabama,
Eastern Division.

Oct. 21, 2003.

Tammy C. Woolley, Emond, Vines, Gorham & Waldrep PC, Birmingham, AL, for Plaintiff.

Randall C. Morgan, Elizabeth B. Carter, Hill, Hill, Carter, Franco, Montgomery, AL, W. Larkin Radney, IV Lightfoot, Franklin & White, L.L.C. Birmingham,

AL, William Larkin Radney, III, Barnes & Radney, P.C., Alexander City, AL, for Defendant.

### ORDER AND MEMORANDUM OPINION

FULLER, District Judge.

## I. INTRODUCTION

This is a case arising under the Americans with Disabilities Act (hereinafter "the ADA"). The Plaintiff, Louis E. Gallups (hereinafter "Gallups") was employed with the Defendant, City of Alexander City, Alabama (hereinafter "the City" or "Alexander City") from December 1997 until June of 2000. During that time Gallups worked in three different city departments. Gallups claims that he was subjected to a hostile work environment and ultimately discharged because the City regarded him as disabled. After his termination, on December 4, 2000, Gallups filed an EEOC charge against the City.[1] On December 3, 2001, Gallups commenced the current action against the City (Doc. # 1). This matter is before the Court on Alexander City's Motion for Summary Judgment (Doc. # 38). For the reasons stated below, the Defendant's Motion for Summary Judgment (Doc. # 38) is due to be GRANTED in part and DENIED in part.

## II. JURISDICTION

Jurisdiction over this matter is asserted pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. 12101 et. seq. (equal opportunity for individuals with disabilities). The parties do not contest personal jurisdiction or venue.

## III. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment may be entered on a claim only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the movant meets its initial burden, the burden then shifts to the nonmovant to make "a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). To satisfy this burden, the nonmovant cannot rest on its pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial. Furthermore, the nonmovant "must do more than simply show that there is

---

**1.** On the copy of the EEOC charge provided to the Defendant and the Court, the date stamp is not legible. For purposes of this motion only, the Defendant assumes that the charge was filed on December 4, 2000, the date Gallups signed the charge.

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir.1993).

The court's function in deciding a motion for summary judgment is to determine whether there exists genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996); *Early*, 907 at 1080.

## IV. FACTS

The Plaintiff, Louis Gallups, suffers from anxiety and depression and has been under the care of a psychiatrist for several years. From December 1997 until June of 2000, Gallups was employed by the Defendant, Alexander City, in three city departments. In December 1997, Gallups began working in the Parks and Recreation Department. In January 1999, Gallups was transferred to the Street Department. Finally, in August of 1999, Gallups was transferred to the Gas Department where he remained until the termination of his employment in June of 2000. Gallups contends that he was subjected to a hostile work environment throughout his employment and ultimately discharged because he was regarded as having a disability. Accordingly, it is necessary to recount the relevant events that occurred during Gallups' employment.

### A. The Parks and Recreation Department

On December 10, 1997,[2] the City hired Gallups to work in the Parks and Recreation department doing maintenance work on a baseball field under the supervision of Wayne Forbus (hereinafter "Forbus"). On March 23, 1998, Forbus evaluated Gallups' performance and gave him scores of three out of five in all areas evaluated. The evaluation form describes a score of three as "fully meets job requirements." Forbus also checked boxes on the evaluation form indicating that Gallups reported to and remained at work as required, followed instructions and observed work rules, got along with and cooperated with co-workers, and had the knowledge, skills, abilities and qualifications needed for successful job performance. In a summary section, Forbus wrote "Louis does what is asked of him and more. Has ability to learn, and wants to do the job better. Works every day and gets along with others." In another section, Forbus indicated that in order to improve his job performance, Gallups simply needed more time on the job to learn specific skills.

On August 19, 1998, Forbus again evaluated Gallups. In this evaluation, Forbus

**2.** The Defendant contends that Gallups was hired in January of 1998. While there is a factual dispute regarding the date on which the City hired Gallups, it is not material to the issues in this case.

gave Gallups scores of two out of five in all areas evaluated. The evaluation form describes a score of two as "essentially meets job requirements." Forbus checked the box indicating that Gallups reported for and remained at work as required. Forbus also checked the box indicating that Gallups followed instructions and observed work rules, but also noted that "Sometimes we send Louis out to do a job and he leaves it to do something else without letting us know." Forbus checked the box indicating that Gallups did not get along and cooperate with co-workers and noted that "Louis is not satisfied with the Sportplex. He does not like the authority over him." Forbus checked the box indicating that Gallups had the knowledge, skill, ability and other qualifications needed for successful job performance and wrote "I know from past experience Louis can do quality work. He has had a change of attitude." Forbus noted that in order to improve his job performance, Gallups needed to "change his attitude, respect authority, do what he is instructed to do." In a summary section, Forbus wrote:

> Louis can do a good job when he wants to. He does not like to be corrected, and he is not happy here in the Sportsplex. He wants to transfer. I don't know if he will be satisfied anywhere there is authority over him. I have had several talks with Louis explaining my reasons for different decisions. He talks with others behind my back, says he just can't please [Forbus]. In my opinion he just wants to do things his way, not mine.

Pursuant to City policy, for the first six months of his employment with the Parks and Recreation Department Gallups was on probationary status. Sometime after the end of this probationary period, Forbus attempted to extend Gallups' probation. The City's personnel director, Doug

Testerman (hereinafter "Testerman"), refused to allow the extension because the initial probationary period had already expired. It is unclear whether Forbus inquired about an extension before or after the August 19, 1998 evaluation.

At some point before mid January, 1999, Forbus became aware that Gallups was on medication. The record does not reflect when and how Forbus became aware of this fact nor whether it was before the August 19, 1998 evaluation or his request to extend Gallups' probation.

### B. The Street Department

On January 7, 1999, Gallups was transferred to the Street Department.[3] The Defendant characterizes this move as simply a voluntary transfer, but Gallups contends that he was transferred due to his alleged inadequate performance and insubordination. Pursuant to City policy, a new six month probationary period began to run when Gallups transferred departments.

Shortly after the transfer, Forbus, Gallups' supervisor in his former department, spoke to Chester Cotney (hereinafter "Cotney"), the superintendent of the Street Department. Forbus asked whether Gallups had informed Cotney that Gallups was on medication. Cotney indicated that Gallups had not.

After the above conversation, Cotney informed Girard Brewer (hereinafter "Brewer"), the city engineer and public works director, that Gallups was on medication. Later, as Gallups was returning to work from a medical appointment, Cotney and Brewer called Gallups into a meeting and asked why he had taken off of work. Gallups said that he preferred not to discuss it, but Cotney and Brewer encouraged Gallups to speak, telling him that whatever he

---

**3.** The transfer was effective starting January 14, 1999.

said was confidential. Cotney and Brewer then asked if Gallups was on any medication. Gallups replied that he was. Cotney and Brewer asked the purpose of the medication and Gallups informed them that he was on anti-depressants for depression. Cotney and Brewer assured Gallups that this information would stay confidential. The City contends that city policy required Cotney and Brewer to inquire about Gallups' medication because he operated heavy equipment and drove trucks.

The City contends that Cotney and Brewer did not tell any other employees about Gallups medication. Gallups contends that he did not discuss his medication with any other employees after the above conversation, but nonetheless his co-workers and supervisors immediately began to harass him about his medication. Gallups provides the following examples of harassment. In July of 1999, after Walt Fuller (hereinafter "Fuller"), the lead foreman made an upsetting comment to Gallups, Jessie Sherrill (hereinafter "Sherrill"), a co-worker and leadman, asked Gallups if he was going home to get a gun. On another occasion in July of 1999, as Gallups put down his flag and left for a doctor's appointment, Fuller commented that "the flag must have gotten too heavy." On other occasions, Fuller made comments pertaining to Gallups medication such as "Looks like you need to go take your medication." At times, Brewer asked Gallups whether he needed to take his medication. On one occasion, Fuller told Gallups' co-workers that he was on Prozac and was crazy and not to make Gallups mad because he may "go off" on them. On another occasion Fuller told an employee that Gallups was not right in the head. Fuller began to tell Gallups to work as a flagman instead of on the machines, even when there was already a sufficient number of flagmen.

In early July 1999, Brewer and Cotney called Gallups into a meeting and asked whether he would switch jobs with a Gas Department employee named Yank. They told Gallups that a new six month probationary period would begin if he transferred to the Gas Department. Gallups said that he did not want to transfer because he liked operating equipment.

In mid July 1999, shortly before Gallups' probationary period with the Street Department was to expire, Cotney told Gallups that he was extending his probation for another six months. City policy permits extensions if the employee is not meeting the standards of the job. When Gallups asked why his probation was going to be extended, Cotney told Gallups that he did not want to go into specifics. Cotney did say that Gallups was doing a good job and that they were satisfied with his performance, but that Gallups had let them down by the amount of time he had taken off of work. When Gallups explained that he had taken comp time for his absences, Cotney did not respond. The City contends that Gallups' probation was extended because of substandard job performance, insubordination, disrespect, inability to take constructive criticism, excessive absences, and a problem with proper notification of absences.

After this meeting, Gallups was approached by Mike Stewart (hereinafter "Stewart"), the superintendent at the Gas Department, who again asked Gallups to switch jobs with Yank. When Gallups indicated that he did not wish to transfer, Stewart told Gallups that Yank would be fired if a switch was not made. Gallups then said he would transfer if his pay remained the same and he received formal training at the Gas Department. Stewart said that he would have to consult with the Mayor, Don McCelland (hereinafter "the Mayor"). Later, Stewart told Gallups that

the Mayor had agreed. Gallups was transferred to the Gas Department on August 3, 1999.[4] The Defendant characterizes this transfer as voluntary and contends that Gallups had inquired about transferring to the Gas Department.

### C. The Gas Department

After the transfer, Stewart approached Gallups and told him that other employees were upset because Gallups was starting at a high rate of salary and that this situation was causing problems. Stewart asked Gallups to talk to the Mayor about another transfer. When Gallups later consulted the Mayor, the Mayor told Gallups not to worry about it and to keep working.

At some point after transferring to the Gas Department, Gallups asked Stewart about the training he had negotiated in the transfer. Stewart informed Gallups that he would not be allowed to attend training until his six month probation was over. Another employee, Kevin Holman, had been allowed to attend training after being on the job for one week. But, this was an exception made because the training had already been paid for and the employee slotted to go was not able to attend.

On October 19, 1999, John Wayne McCrary (hereinafter "McCrary"), a leadman and supervisor in the Gas Department, told Gallups that he and the other Gas Department employees did not think it was right that Gallups had started at such a high rate of pay. Gallups contends that thereafter he was harrassed by McCrary continually for five days. On the fifth day, Gallups and McCrary had a confrontation. After McCrary made a comment to Gallups about his pay, Gallups said, "Don't mention my name again about the money I make or anything else. If you have a problem with it, go to the supervisor." McCrary then cussed at Gallups and threatened him. Later that day,

Stewart asked Gallups what had happened. After Gallups recounted the confrontation, Stewart asked Gallups whether he could work with McCrary. Gallups said he could, but he did not want to hear anything else about his pay. Later on the same day, Stewart reprimanded Gallups, stating that Gallups had pointed his finger in McCrary's face. Gallups told him that he had not pointed his finger and that in fact it was McCrary who had threatened Gallups. Gallups was officially reprimanded, but McCrary received no discipline for the incident. On at least two occasions, McCrary expressed concern to Stewart about Gallups' use of medication.

On November 15, 1999, Stewart learned that Gallups was taking Prozac. One month later he called a local pharmacy to inquire about the medication. On December 22, 1999, Stewart told Gallups that he believed the incident with McCrary had happened because Gallups was not on his medication. Stewart then told Gallups that he did not think that Gallups was going to be able to do his job and that his probation was going to be extended for an additional six months. Stewart suggested that Gallups look for a job in a different department. On January 27, 2000, Gallups' probation was officially extended due to alleged inadequate job performance, aggressive behavior, habitual problems with housekeeping duties, and confrontations with co-workers.

At some point during his employment at the Gas Department, Gallups was looking at a job posting for a landfill equipment operator. A supervisor in the Gas Department, David Moore (hereinafter "Moore"), observed Gallups and made a comment about the qualifications concerning drug testing. Moore then told Gallups that he could not get the landfill position because he was a drug addict and repeatedly called

---

4. The transfer was effective starting August 5, 1999.

Gallups a "drug head." Moore also informed Gallups that everyone at the Gas Department already knew what kind of medication Gallups was on because they had heard from the Street Department[5].

At some point during his employment at the Gas Department, Stewart informed Gallups that a coworker, Kevin Holman (hereinafter "Holman"), had complained that Gallups had not picked up his tools. Gallups contends that immediately after Stewart told Gallups about this accusation, Stewart apologized to Holman for using his name in a fabricated complaint. This apology suggests that Stewart had simply made up the allegation against Gallups. Stewart also confronted Gallups about an allegation that Gallups was throwing meters, an incident which Gallups contends never occurred.

On January 27, 2000, McCrary evaluated Gallups' performance. Gallups received a score of two out of five in all areas. A score of two means that the employee "essentially meets job requirements." McCrary also checked boxes indicating that Gallups remained at work as required, followed instructions and observed work rules and got along and cooperated with co-workers. McCrary checked the box indicating that Gallups did not have the knowledge, skills, abilities and other qualifications needed for successful job performance and noted that this was because Gallups needed training, schooling, and on the job training. In another section, McCrary indicated that to improve his job performance, Gallups needed to be more involved on each job. In a summary section, McCrary noted that Gallups overall job performance was "fair at this level of knowledge and skills" but that Gallups needed to be "more involved."

On May 30, 2000, McCrary again evaluated Gallups. Gallups received a score of three out of five in one area of performance. A three indicates that the employee "fully meets job requirements." In the remaining areas, Gallups received a two out of five. A score of two indicates that the employee "essentially meets job requirements." In the areas in which Gallups received a score of two, McCrary noted that there had been improvement in Gallups' performance. McCrary checked boxes indicating that Gallups reported for and remained at work as required, followed instructions and observed work rules, and got along with and cooperated with co-workers on the job. McCrary checked the box indicating that Gallups did not have the knowledge, skills, abilities and other qualificaitons needed for successful job performance and noted that Gallups needed training in some areas. In a summary section, McCrary noted that Gallups "continues to make improvements in some areas; need[s] to work on improving some other areas."

Sometime between April 20, 2000 and June 5, 2000, Rich L. Jones (hereinafter "Jones") of Jones Construction Company called the City for an employment reference on Gallups. Jones spoke with Stewart. Stewart told Jones that Gallups was a "good worker," but that his "only concern" was that Gallups was on "some kind of prescription medication." Jones inferred from Stewart's tone that Gallups was a less desirable employee. Jones ultimately did not hire Gallups.

On June 1, 2000, Holman, one of Gallups' co-workers, allegedly saw Gallups playing a radio against company rules. Holman apparently reported the incident to Stewart. Holman later told Stewart

---

**5.** The timing of this incident is unclear. At one point in his brief, Gallups contends that it occurred after the December 22, 1999 conversation, but at another point Gallups contends that it occurred as soon as he began at the Gas Department.

that he was afraid of what Gallulps might do if Gallups knew that Holman had reported Gallups for breaking rules. Holman indicated that he was afraid that Gallups would take action against him and his family.

On June 5, 2000, Stewart spoke with the Mayor about discharging Gallups and the Mayor authorized the termination of Gallups' employment. Before speaking with Gallups, Stewart told Testerman, the City's personnel director, that Gallups was resigning.[6] Then Stewart met with Gallups and told him that his probation was going to be extended in July. Gallups informed Stewart that he would not quit. Stewart then terminated Gallups employment effective June 7, 2000.[7]

Gallups contends that during his employment he repeatedly complained about other employees harassing him about his medication. He complained to the Mayor, city councilman I.J. Mobley (hereinafter "Mobley"), and Stewart. Nobody took action on Gallups behalf. The Mayor told Gallups to shut his mouth and go back to work. Mobley advised Gallups to go ahead and sue the City. Stewart told Gallups that he could not stop the other employees from harassing him about his medicine.[8]

The City points out that Gallups was allowed to work in the afternoons and weekends so that he could build up his vacation and sick leave and create enough income to pay for his medical insurance. This was a special allowance for Gallups

and not a typical benefit given to employees. It is not clear when this special treatment began or how long it lasted.

Gallups filed an EEOC charge on Monday, December 4, 2000.[9] The EEOC apparently notified Gallups that his charge was untimely, but this documentation was not provided to the Court.

## V. DISCUSSION

The City contends that it is entitled to summary judgement for four reasons. First, Gallups' EEOC charge was untimely filed and therefore Gallups' current claim must be dismissed for failure to timely exhaust administrative remedies. Second, Gallups is not a qualified individual under the ADA both because the City did not regard him as disabled and because he could not perform the essential functions of his job with or without reasonable accommodation. Third, the City has proffered legitimate, nondiscriminatory reasons for terminating Gallups, and Gallups cannot meet his burden of offering evidence of pretext. And fourth, the evidence is insufficient to establish that Gallups was subjected to severe or pervasive harassment based on a perceived disability.

### A. Timeliness of the EEOC Charge

 Before a plaintiff can file a civil suit against an employer under the ADA, the employee must file a timely EEOC charge. *See* 42 U.S.C. §§ 12117(a),

---

**6.** The City contends that Stewart did not speak with Testerman until after meeting with Gallups.

**7.** The City contends that Gallups quit after Stewart told him to look for another job, but for purposes of this motion only the City will assume that Gallups was discharged.

**8.** The City contends that Stewart was under the impression that Gallups had taken medi-

cation in front of other employees and that the employees were simply asking about the medication. Stewart was not under the impression that Gallups was being harassed.

**9.** On the copy of the EEOC charge provided to the City and the Court, the date stamp is not legible. For purposes of this motion only, the City assumes that the charge was filed on December 4, 2000, the date Gallups signed the charge.

2000(e)(5)(1). To be timely, the charge must be filed within one hundred and eighty days from the date the alleged unlawful employment practice occurred. *Id.* The United States Supreme Court has explained that "strict adherence" to this procedural requirement is the "best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). By choosing this relatively short deadline, "Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Id.* This procedural rule is not a mere technicality, but rather is an integral part of Congress' statutory scheme that should not be "disregarded by courts out of vague sympathy for particular litigants." *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). Therefore, if a Plaintiff fails to file an EEOC charge within the one hundred and eighty day period, the lawsuit must be dismissed for failure to exhaust administrative remedies.[10]

■ In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court set out standards for courts to use in order to determine when the alleged unlawful employment action "occurred." *See Morgan,* 536 U.S. at 114, 122 S.Ct. 2061. The standard varies depending on whether the claim involves a "discrete act" or a "hostile environment" allegation. *Id.* In cases involving both types of claims, courts are to apply the appropriate analysis to each. *Id.* Discrete discriminatory acts, such as termination, occur on the day the decision is made and the employee receives notice of it. *See Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). Each such act starts a new clock for filing charges. *See Morgan,* 536 U.S. at 114, 122 S.Ct. 2061. Hostile environment claims, however, comprise a series of separate acts that collectively constitute one. *Id.* Therefore an EEOC charge is timely as long as it is filed within one hundred and eighty days after an act contributing to the claim occurs. *Id.* This analysis supercedes the use of the "continuing violation doctrine" as it was understood before *Morgan. See id.*

■ Gallups alleges both a discrete act, namely his termination, and a hostile working environment.[11] Applying the *Morgan* analysis, the termination occurred on June 5, 2000 when Stewart decided to terminate Gallups and informed Gallups of that decision. It is irrelevant that the termination was deemed effective June 7, 2000. Once the decision was made and Gallups received notice of that decision, the act "occurred" and the clock began to run. Counting from June 5, 2000, the one hundred and eighty day deadline falls on Saturday, December 2, 2000. Gallups filed his EEOC charge on Monday, December 4, 2000, the next business day after the deadline. Although there is no Eleventh Circuit authority concerning this situation, at least one other Circuit Court of Appeals has held a filing timely in these circumstances. *See Clark v. Resistoflex Co.,* 854 F.2d 762, 766 n. 3 (5th Cir.1988) (explain-

10. The time limitation is subject to equitable doctrines such as tolling and estoppel, but these doctrines are to be applied sparingly. *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Gallups has not invoked these equitable doctrines nor has he provided the Court with any facts that would support their application.

11. Some of the events which Gallups contends comprise the hostile working environment may be more properly construed as discrete acts. For example, his multiple extensions of probation are likely discrete acts. However, because Gallups' hostile environment claim is time barred, the Court need not decide the issue.

**1296**

ing that employee had until Monday to file his EEOC charge when the one hundred and eighty day deadline fell on a Saturday). The Court finds that Gallups' EEOC charge was timely filed as it relates to his termination claim.

■ Gallups' hostile work environment claim, however, is not timely. The last event which could arguably constitute an act contributing to a hostile work environment is the June 1, 2000 incident involving Gallups' radio use. One hundred and eighty days from June 1, 2000 falls on Tuesday, November 28, 2000. Because Gallups did not file until the following Monday, his EEOC charge is untimely as it relates to his hostile work environment claim. Accordingly, this claim is due to be dismissed for failure to exhaust administrative remedies.[12] Because Gallups' harassment claim is dismissed, the Court need not address the issue of whether the alleged harassment was "severe and pervasive." The remainder of this opinion will address Gallups' termination claim only.

### B. Gallups' Status as a Qualified Individual Under the ADA

■ The ADA mandates that an employer shall not discriminate against an otherwise qualified individual with a disability because of the disability in regard to employment decisions, including termination. *See* 42 U.S.C. § 12112(a); *Hilburn v. Murata Elec. N. Am., Inc.,* 181 F.3d 1220, 1226 (11th Cir.1999). In order to establish a prima facie case of discrimination under the ADA, Gallups must demonstrate that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as a result of his disability. *See Cash v. Smith,* 231 F.3d 1301, 1305 (11th

Cir.2000); *Sutton v. Lader,* 185 F.3d 1203, 1207 (11th Cir.1999). The City focuses on the first two prongs of the prima facie case, arguing that Gallups is not disabled and is not otherwise qualified for his position. The Court will address each issue in turn. Because the City did not present argument on the third prong, the Court need not address it.

### 1. Disability

■ The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A number of regulations interpret and clarify this definition. First, the regulations explain that a person is "regarded as" having a disability if he meets any one of the following descriptions: he has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; he has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or he has no physical or mental impairment but is treated by an employer as having such an impairment. 29 C.F.R. § 1630.2(*l*). Second, the regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Last, the regulations direct the court to consider three factors when determining whether an impairment rises to the level of "substantially" limiting: (1) the nature and severity of the

---

**12.** There is some question as to whether a hostile work environment claim can stand under the ADA. However, because Gallups did not timely file his charge of discrimination with respect to this claim, the Court need not decide the issue. *See Stedman v. Bizmart, Inc.,* 219 F.Supp.2d 1212, 1219 n. 16 (N.D.Ala.2002).

impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2). When the plaintiff claims that the major life activity is working, the regulations are more specific about the meaning of "substantially." The plaintiff must be able to prove that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Case law has emphasized that the plaintiff must be precluded from more than one particular task or type of job to rise to the level of "substantially" limited. *See Sutton v. United Air Lines,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Cash,* 231 F.3d at 1306.

Gallups contends that the City regarded him as having an impairment, namely anxiety, depression and/or the use of medication for these diseases, that substantially limited his major life activity of working and therefore he has a disability within the meaning of the ADA. Because Gallups has provided little evidence of the nature or extent of any impairment, the Court assumes that Gallups contends that he has no physical or mental impairment but was treated by his employer as having such an impairment. Applying the above regulatory framework, to survive the Defendant's motion for summary judgment, Gallups must point the court to evidence from which a reasonable fact finder could conclude that the City perceived Gallups as having an impairment that limited his ability to work such that he was unable to perform a broad range of jobs or class of jobs on more than a short term basis. Gallups has met this burden.

Gallups presents the following evidence to support his contention that the City perceived him as disabled:

1. Forbus, Gallups' supervisor at the Recreation Department informed Gallups' new supervisor, Cotney, that Gallups was on medication.

2. Cotney had a meeting with Brewer, another supervisor, about Gallups' medication.

3. Cotney and Brewer met with Gallups and asked him about his medication.

4. Fuller, a supervisor at the Street Department, commented that "the flag must have gotten too heavy" as Gallups laid down his flag to leave for a medical appointment.

5. On occasion, Fuller made comments to Gallups to the effect of "Looks like you need to take your medication."

6. On occasion, Brewer asked Gallups whether he needed to take his medication.

7. On one occasion, Fuller told Gallups' co-workers that he was on Prozac and was "crazy" and not to make him mad because he may "go off."

8. On another occasion Fuller told an employee that Gallups was "not right in the head."

9. Fuller increasingly asked Gallups to work as a flagman rather than on machines, even when there was a sufficient number of flagmen.

10. On at least two occasions, McCrary, a supervisor at the Gas Department, expressed concern to Stewart, another supervisor, about Gallups medication.

11. When Stewart found out that Gallups was taking Prozac, he called a pharmacy to inquire about the medication.

12. Stewart told Gallups that he believed that an incident for which Gallups

was reprimanded occurred because Gallups failed to take his medication. Directly after this comment, Stewart told Gallups that he did not think Gallups could perform his job and that his probation was going to be extended.

13. Moore, a supervisor at the Gas Department, told Gallups that he did not have the qualifications for a job as a landfill equipment operator because he was a drug addict and "drug head."

14. When an outside employer asked Stewart for a reference on Gallups, Stewart informed the employer that Gallups was a "good worker" but that his "only concern" was that Gallups was on "some kind of prescription medication." The employer inferred from Stewart's tone that Gallups was a less desirable employee.

15. Over his two and one-half years of employment with the City, Gallups was transferred twice, triggering new probationary periods, and his probation was extended both at the Street Department and the Gas Department. As a consequence, Gallups was continually kept on probationary status.

Viewed in totality, Gallups' supervisors' comments and actions are sufficient evidence upon which a reasonable fact finder could conclude that the City regarded Gallups as unable to perform his job or any City job due to a mental impairment. The purpose of the "regarded as" prong is to cover individuals subjected to adverse employment decisions because of the myths, fears, and stereotypes associated with a disability. *See* 29 C.F.R. Pt.1630, App. § 1630.2(*l*); *see also Sutton*, 527 U.S. at 489–90, 119 S.Ct. 2139 (explaining that the purpose of the "regarded as" prong is to protect individuals from misperceptions that result from stereotypic assumptions not truly indicative of individual ability (quoting in part 42 U.S.C. § 12101(7)(a))); *School Bd. of Nassau Cty. v. Arline*, 480

U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (explaining that by amending the Rehabilitation Act of 1973 to cover those regarded as having a disability, Congress "acknowledged society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.") Viewing the facts and the reasonable inferences which could be drawn from the facts in the light most favorable to the Gallups, Gallups was subjected to exactly the kind of stereotypical assumptions that the "regarded as" prong is intended to cover. Once his supervisors found out he was taking medication for depression and anxiety, they began to view him as "crazy" and "not right in the head" in the words of one supervisor. Considering the above evidence in totality, a reasonable fact finder could conclude that Gallups' supervisors believed that because Gallups was "crazy" he was unfit for any job with the City. As a result, he was transferred from job to job, his probation was repeatedly extended, and ultimately he was terminated.

The case that the City relies upon is distinguishable. In *Pouncy v. Vulcan Materials, Co.*, 920 F.Supp. 1566 (N.D.Ala. 1996), the District Court for the Northern District of Alabama held that the there was insufficient evidence to show that the defendant regarded the plaintiff as substantially impaired in a broad range of jobs. Unlike in our case, the plaintiff in *Pouncy* pointed to only a few facts to support her contention. In contrast, Gallups points to a relatively large number of facts which, when viewed in totality, suggest that the City viewed Gallups as "crazy" and therefore unfit to work.

Although not cited by the City, the Court feels compelled to distinguish two more cases. In *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir.1999) and in

*Phillips v. Wal–Mart Stores, Inc.,* 78 F.Supp.2d 1274 (S.D.Ala.1999), each Court held that the plaintiff had not demonstrated that the Defendant viewed him as substantially impaired in a broad range of jobs. *Watson* distinguishable for the same reason as *Pouncy.* Gallups has simply presented the court with a greater amount of evidence from which a reasonable juror could conclude that the City perceived that Gallups was generally unfit for all jobs. In *Phillips,* the plaintiff presented evidence of harassment related to his perceived disability that is somewhat similar to the evidence that Gallups presents. The evidence in Gallups' case, however, is more persuasive because there is more of a link between his perceived disability and the verbal harassment and adverse employment actions. In *Phillips,* the plaintiff presented evidence of a number of comments relating to his perceived disability made by co-workers and one supervisor. However, there was also ample evidence that the plaintiff was performing his job poorly and that his poor performance was the impetus behind his official reprimands and other adverse employment actions. *See Phillips,* 78 F.Supp.2d at 1288. In contrast, in Gallups' case, there is less evidence that he was performing his job poorly. Rather, there is a good deal of evidence showing a pattern of verbal abuse relating to his being medicated or "crazy" followed closely by adverse employment actions including continued probation, multiple transfers, and ultimately termination. The Court is compelled to distinguish *Phillips* on an additional point. In *Phillips* the plaintiff received evaluations that rated him as "standard" and the Court used the evaluations as evidence that the defendant-employer did not view the plaintiff as substantially impaired. There are similar evaluations in Gallups' case. Although these evaluations may constitute evidence tending to show that the City did not view Gallups as substantially impaired, Gallups

also presented a substantial amount of evidence, namely the pattern of verbal harassment and adverse employment actions, that tends to demonstrate just the opposite conclusion. Because there is conflicting evidence, balancing that evidence to make a final determination is a question for the fact finder. For these reasons, *Phillips* is distinguishable from the present case.

### 2. Otherwise Qualified

 Turning to the second prong of the prima facie case, Gallups must point the Court to evidence from which a reasonable fact finder could conclude that Gallups was otherwise qualified to do his job during the relevant time frame. In the employment context, an otherwise qualified person is one who satisfies the requisite skill, experience, education, and other job related requirements and who can perform the essential functions of the job with or without reasonable accommodation. 29 C.F.R. § 1630.2(m); *see also Sutton,* 185 F.3d at 1210. Gallups has met his burden.

Gallups points to two pieces of evidence to support his contention that he was able to perform the essential functions of the job at the time he was terminated. First, in his May 30, 2000 evaluation, conducted six days before his termination, he received a score of three out of five in one area of performance, indicating that he "fully" met the job requirements in that area. In the other two areas of performance, he received a score of two out of five, indicating that he "essentially" met the job requirements. The Court recognizes that the phrase "essentially meets the job requirements" on the City's evaluation form does not necessarily equate to "able to perform essential functions" within the meaning of the ADA. But, a reasonable fact finder could so conclude and therefore there is a disputed material question of

fact. The City points out that on the same evaluation, the box was checked indicating that Gallups "did not have the knowledge, skills, abilities or other qualifications needed for successful job performance." However, the Court notes that next to this check mark, the evaluator indicated only that Gallups needed training. Considering that on evaluations in a previous department Gallups was marked as having the necessary skills and abilities to do his job, Gallups agreed to move to the Gas Department only on the condition that he be trained, and the City denied Gallups that training opportunity, the Court is loath to find that a lack of training could now serve as the basis for the City's contention that Gallups is not qualified. However, the Court need not decide the issue. A reasonable fact finder could conclude that the "essentially meets job requirements" scores contradict the contention that Gallups did not have the ability to do the job. Therefore, there is a disputed issue of material fact for the fact finder.

Gallups also points to Stewart's recommendation as evidence that he was otherwise qualified for his job at the time he was terminated. Within two months preceding the termination, Jones, an outside employer, called Stewart, Gallups' then supervisor, for a reference. Stewart stated that Gallups was a "good worker" and that his "only" concern was that Gallups was on medication. A reasonable fact finder could infer from this statement that but for problems that Stewart associated with Gallups' use of medication, Stewart considered Gallups otherwise qualified for his job.

### C. Evidence of Pretext

■ Under the *McDonnell Douglas* framework, after a plaintiff meets his initial burden of proving a prima facie case of discrimination, a defendant must articulate some legitimate, non-discriminatory reason for the termination. If the defendant meets this burden of production, the plaintiff has the ultimate burden of proving that he has been the victim of discrimination. At the summary judgement level, this means that the plaintiff must present sufficient evidence for a reasonable fact finder to conclude that the employer's articulated reasons are pretextual by presenting concrete evidence in the form of specific facts that either show that a disability played an impermissible role in the employer's decision or that the proffered nondiscriminatory reasons are unworthy of credence. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Pouncy v. Vulcan Materials Co.*, 920 F.Supp. 1566, 1579 (N.D.Ala.1996). The City contends that Gallups has not met this burden and therefore summary judgment is appropriate. The Court disagrees. Gallups has presented sufficient evidence to meet his burden.

The City offers the following non-discriminatory reasons for its termination decision:

1. Gallups had confrontations with other employees regarding rate of pay;

2. Gallups was given a written warning about aggressive behavior;

3. Gallups had habitual problems with putting tools away and other housekeeping issues associated with his job;

4. While operating a backhoe/excavator Gallups damaged trees and fences after being warned to stay away from the trees and fences;

5. Gallups was unable to perform tasks that an average operator should be able to perform, for example moving a rock from the edge of a ditch;

6. Gallups was unable to dig around the gas lines without causing further damage to the gas line;

7. Gallups was unable to assist an employee while working on a live line in a ditch, which created a dangerous situa-

tion in which employees could have been harmed.

To demonstrate that these reasons are pretextual, Gallups points to several pieces of evidence. Regarding the City's contentions that Gallups had confrontations with other employees about his rate of pay and that Gallups received a warning about aggressive behavior, Gallups offers a version of the events that suggests pretext. According to Gallups' testimony, he did not initially want to transfer to the Gas Department in part because he was concerned about his rate of pay. Stewart, the supervisor at the Gas Department, convinced him to transfer in part by assuring him that his rate of pay would remain the same. After employees began harassing Gallups about the pay difference, Gallups spoke to the Mayor about a transfer. The Mayor told Gallups to return to his current position. The written warning for aggressive behavior was a result of continual harassment about Gallups rate of pay. Further, Gallups contends that he did not commit the behavior for which he was written up and that the other man involved, McCrary, was the instigator. McCrary was not written up for the incident. Gallups supervisors, including McCrary, knew about Gallups medication before these incidents occurred. Viewing these facts in the light most favorable to Gallups, a reasonable fact finder could conclude that the City put Gallups in a situation in which other employees were likely to resent and harass him, refused to help him resolve the situation, and then unfairly singled him out for written reprimand when the situation predictably escalated to a confrontation. The fact finder could reasonably infer that this was done because the Defendant regarded Gallups as having a disability. Gallups also points to his May 30, 2000 evaluation, prepared six days before Gallups was terminated, in which the box was checked indicating that Gallups got along with and cooperated with

co-workers on the job. Viewing this fact in the light most favorable to Gallups, the Court finds that a reasonable fact finder could conclude that overall Gallups got along with his co-workers and therefore the Defendant's reason is pretextual.

Regarding the City's contention that Gallups had habitual problems with housekeeping issues, Gallups again offers evidence to suggest pretext. In his testimony, Gallups describes an incident in which Stewart told Gallups that a co-worker, Holman, had complained about Gallups' not picking up his tools. Gallups contends that immediately after this incident, Stewart apologized to Holman for using his name in a fabricated complaint, suggesting that Stewart simply made up the complaint. Also, on the May 30, 2000 evaluation, prepared six days before Gallups' termination, the box was checked indicating that Gallups followed instructions and observed work rules. Viewing these facts in the light most favorable to Gallups, the Court finds that a reasonable fact finder could conclude that the City's contention that Gallups had habitual problems with housekeeping issues is pretextual.

The City's remaining reasons for termination all involve inadequate performance of various job skills. Gallups again points to the May 30, 2000 evaluation as evidence of pretext. Gallups argues that he would not have received scores of two and three, indicating essentially meets job requirements and fully meets job requirements respectively, if his job performance was so inadequate as to warrant termination. The evaluation did indicate that Gallups lacked the ability to do his job, but next to this check mark the evaluator noted only that Gallups required training. As discussed above, because Gallups transferred to the Gas Department on the condition that he receive training and was then denied a training opportunity, the Court is

loath to hold his lack of training against Gallups. In Gallups' evaluations previous to his transfer to the Gas Department the evaluator indicated that Gallups *did* have the ability to do his job. Gallups also points to Stewart's comment to Jones, that Gallups was a "good worker" and that his "only" concern was that Gallups was on medication. A reasonable fact finder could infer from this comment that Stewart's concerns about Gallups' performance stemmed from Gallups' use of medication (or rather Stewart's conceptions about that use) and therefore disability played an impermissible role in the termination decision. In sum, Gallups has presented sufficient evidence in the form of specific facts such that a reasonable fact finder could conclude that the City's articulated reasons for terminating Gallups are pretextual.

## VI. CONCLUSION

For the foregoing reasons Defendant's Motion for Summary Judgment (Doc. # 38) is due to be GRANTED in part and DENIED in part. Plaintiff's claim for hostile work environment is DISMISSED due to failure to exhaust administrative remedies. Accordingly, Defendant's Motion for Summary Judgement on Plaintiff's hostile environment claim is GRANTED. However, Defendant's Motion for Summary Judgment on Plaintiff's unlawful termination claim is DENIED.